THE BANKERS' UNION OF THE WORLD v. LEATHIE P. CRAWFORD *et al.*

No. 13,232.   (73 Pac. 79.)

SYLLABUS BY THE COURT.

1. CORPORATIONS—*Powers.* A corporation has only such powers as are expressly conferred upon it by its charter, or such as are necessarily implied therefrom, to enable it to carry out the objects of its creation. The exercise of all other powers by it is *ultra vires* and void.

2. FRATERNAL INSURANCE—*Consolidation.* No authority exists in the statute for the consolidation of fraternal beneficiary associations.

3. ———— *Payment to Members and Beneficiaries Only.* Fraternal beneficiary associations created under the statutes of this state have power to make payment of benefits only to their mem-

29—67 KAN.

| 67 | 449 |
| 70 | 86 |
| 67 | 449 |
| c76 | 761 |
| 67 | 449 |
| 78 | 311 |

bers, or the beneficiaries named by such members, such payment to be made out of funds contributed by members for that purpose.

4. —————— *Contract of Consolidation Held Void.* A contract by one such association to pay a death loss of another like association already accrued, in consideration of the transfer to it of the membership and offices of such other association, is unauthorized by the statutes of the state, *ultra vires,* and void.

5. —————— *Association Not Estopped to Plead Ultra Vires.* Such an association which has assumed the payment of death losses of another association already accrued is not estopped to deny the *ultra vires* character of such assumption by reason of the fact that large numbers of the latter association were induced to become members of the former; nor by the further reason that, by the resignation of the officers of the latter association, it was placed in the hands of officers named by those who were managing the former.

Error from Shawnee district court; Z. T. HAZEN, judge. Opinion filed July 10, 1903. Reversed.

*Edwin A. Austin,* and *Otis E. Hungate,* for plaintiff in error.

*W. E. Atchison,* for defendant in error Leathie P. Crawford.

The opinion of the court was delivered by

CUNNINGHAM, J.: Leathie P. Crawford sought to recover from the Bankers' Union of the World. Its demurrer to her petition was overruled. Did the court err in so doing? The material portions of her petition are substantially as follows: The National Aid Association is a fraternal insurance or beneficiary corporation, organized under the laws of Kansas; W. A. S. Bird is receiver of this association, and as such receiver has the custody, control and possession of all its records and assets; the Bankers' Union of the World is a fraternal insurance corporation organized under the laws of the state of Nebraska, and doing

business under the laws of the states of Nebraska and Kansas; William H. Crawford, who was the husband of the plaintiff, joined the National Aid Association, and as a member thereof received a beneficiary certificate containing stipulations as follows:

"This certificate of membership witnesseth, that in consideration of the representations made by William H. Crawford in his application for membership in said National Aid Association, which is hereby made a part of this contract, said member further complying with the by-laws, rules and regulations governing said National Aid Association, then and in that case the said National Aid Association hereby promises and binds itself that, upon satisfactory evidence, in accordance with its by-laws, of the death of William H. Crawford, the person named and described in the application for which this certificate is issued, to pay to his wife, Leathie P. Crawford, the beneficiary mentioned in said application, the sum of $1000, or such a sum as shall be derived from the benefit fund upon an assessment made,for said death on all its members, as provided in its by-laws, less the amount which has been paid to said member on account of loss of eye or limb or the old-age benefit; and said sum, not to exceed the amount of $1000, shall be received by said beneficiary in full of all claims against the said National Aid Association by virtue of this certificate."

It was further alleged that the said William H. Crawford died in good standing in said National Aid Association on the 5th of October, 1901, the plaintiff being his beneficiary named in said certificate; that due and timely proof of his death was made; that afterward, no amount having been paid on the certificate, the officers of the National Aid Association became convinced that on account of the low rate of assessment and the slow growth of the National Aid Association, for the protection of its membership and to guarantee the payment of its

death losses, it was necessary to combine with some other fraternal order whose rate of assessment was higher, and whose growth was more rapid; that it could not continue in business with its low rate of assessment and meet its death losses promptly; that it was necessary for the protection of its members to consolidate with some growing order that was larger and had a higher rate of assessment; that the Bankers' Union of the World presented to the officers of the National Aid Association a proposition to consolidate the two orders; that this proposition was accepted by the latter, and a formal agreement entered into between these two associations, whereby the Bankers' Union undertook to pay certain liabilities for death losses which had accrued under the beneficiary certificates issued by the National Aid Association, of which that due to the plaintiff was one. The writing containing this agreement, so far as it refers to this matter, was evidenced by the memorandum of date October 12, 1901, and is as follows:

"Liabilities of which the National Aid has official notice, not exceeding $27,330 uncontested, and $7000 contested, to be assumed and agreed to be paid by the Bankers' Union of the World and Spinney" (its president), "according to the constitution and by-laws of the National Aid."

Afterward this memorandum was put in a more formal shape and this contract of assumption appears therein as follows:

"5. The said E. C. Spinney and the Bankers' Union of the World, upon the consummation of said consolidation and as a part of said consolidation, shall agree to assume and agree to pay all the just and lawful claims for death losses against the said association of which the said association has official notice, not exceeding $27,330 uncontested liabilities and $7000 contested

liabilities.    By the term 'uncontested liabilities' is
meant such liabilities as are not known to be spurious
or fraudulent, but the said The Bankers' Union of the
World and E. C. Spinney reserve the right to contest
any of said liabilities for any reasons which may be
deemed sufficient by competent and reliable counsel.
The said officers of the said association, or either of
them, shall preclude the said E. C. Spinney and the
Bankers' Union of the World from their right of con-
test as aforesaid.

"By the term 'contested liabilities' is meant such
claims against said association as the officers thereof
may deem to be and have classified as spurious and
illegal, and such claims shall not be deemed to be lia-
bilities of said association until established to be such
by judgment of court.    Said liabilities to be assumed
and paid by said E. C. Spinney and the said Bankers'
Union of the World according to the constitution and
by-laws of the National Aid Association."

This contract provided that the general officers of
the National Aid Association should do all they could
to secure a transfer of the management of that asso-
ciation to the Bankers' Union, and to accomplish the
same should resign from their respective positions,
and procure persons selected by the Bankers' Union
to be elected officers of the National Aid Association;
that they should devote their time until the 1st of
January, 1903, to the consummation of such consoli-
dation, by procuring members of the National Aid
Association to become members of the Bankers'
Union, and for their services they were to receive the
sum of $2500, if consolidation should be consum-
mated, and a less sum if through no fault of theirs it
should not be; that they should receive the further
sum of $10,000 which was evidenced by notes given,
and payable at intervals commencing on the 1st of
November, 1901; that when consolidation should be
accomplished, the National Aid Association should

turn over to the combined management all the furniture and supplies owned by it, and $1300 which was then on deposit to its credit.

The petition further alleged that all of the conditions of this agreement were complied with by both parties thereto, the National Aid Association officers resigning their offices and procuring the selection of officers indicated by the Bankers' Union to fill the same, and all of the business of the former to be placed under the control of officers so selected by the Bankers' Union, which paid to the retiring officers the sum of $2500 as agreed; that by reason of such consolidation the Bankers' Union obtained an increase in its membership of about 4000, who paid into the treasury the sum of $4000 per month; that this plan and its consummation received the approval of the insurance commissioner of the state of Kansas.

The demurrer contained several grounds, the most meritorious ones being that the agreement counted upon was *ultra vires* as to both associations, and that the petition did not state facts sufficient to constitute a cause of action.

It will be observed that the plaintiff below sought to recover against the Bankers' Union, not by virtue of a contract which it had made with her or her husband, but by virtue of a contract which had been made with the National Aid Association, and the fulfillment of which, as was claimed, had been assumed by the Bankers' Union, so that the questions, as logically presented, are : (1) Has the agreement entered into by these associations any force or binding effect upon the Bankers' Union, so far as it requires a payment to Mrs. Crawford? Or, put in another form, was the agreement, so far as it concerned her, within the power of these associations, and is the Bankers'

Union bound to her thereby?    (2)  If this agreement is within the power of the Bankers' Union, so far as Mrs. Crawford is concerned, what was its extent, and what liability was incurred by it thereby?

Taking up the question of power, we suggest that the statutes of Nebraska are not pleaded; hence the presumption is that they are the same as found in Kansas.   That they are so in fact is admitted by the attorneys for both parties.   We need take small space in the discussion of the universally recognized rule that a corporation has only such power as is conferred upon it by its charter, either expressly or by implication, to enable it to carry out the objects of its creation, and that the exercise of powers outside and beyond these is an act *ultra vires* and not binding upon the corporation.   The implication authorizing the exercise of a power must be one necessarily arising from a granted power, as distinguished from what might be convenient or desirable.   It is not sufficient to authorize a corporation to act that no limitation is found in the law forbidding the act.   The right to act must be conferred expressly or by necessary implication, or it does not exist.

We have searched the statute in vain to find adequate warrant therein for a transaction such as is stated in plaintiff's petition.   It is claimed that section 3575 of the General Statutes of 1901, relating to fraternal beneficiary societies, which authorizes such societies to make and enforce contracts in relation to their business, implies the right to make the contract in question.   It is suggested that the increase of members is the chief object of the existence of these beneficiary associations; hence an agreement made to promote that end would be one in relation to the business of the corporation.   While, of course, no

corporation, much less o'ne of this character, could exist without persons connected therewith, nor could one like this long exist without a constant accession to its membership, it surely is a misuse of terms to say that the obtaining of members is the business of the corporation. Members enable it to pursue its business, but the obtaining of members is not its business. Its business is defined in the statute to be the making of provision for the payment of benefits in case of death, sickness, or temporary disability, and this business must be carried on for the sole benefit of its members and their beneficiaries. For the purpose of carrying on this business, such associations are authorized by the statute to create a fund "from which the expenses of such association shall be defrayed," which "shall be derived from assessments, premiums or dues from its members, and interest accumulations thereon." Thus it appears clearly that these associations are to be administered for the sole benefit of their members and their beneficiaries, by means of assessments and dues collected from such members; that is, that only members may be called upon to contribute, and only they or their beneficiaries may receive indemnity.

These associations are not permitted to go out and engage generally in the business of furnishing indemnity. Their distinct characteristics and charter life would be destroyed in so doing. The agreement counted upon in the case at bar contemplates the payment of money to one not a member of the Bankers' Union from moneys not received from the association of which plaintiff is not a beneficiary. Such a transaction is wholly outside the letter and spirit of the charter act and in excess of any power conferred upon

the association ; the making and procuring of it is therefore *ultra vires* and not to be enforced.

The contract upon which plaintiff counts, as she claims it to be, is entirely different from that which she had with the National Aid Association.  That was one to pay the proceeds of one assessment, up to $1000 ; this is to pay $1000 absolutely.   It is, however, granted by the defendant in error that, while the Bankers' Union would not be permitted to collect money from an assessment upon its members for the purpose of paying the death loss of one who had never been a member, yet it is competent for it to pay this death loss out of the expense fund which the association is authorized to accumulate ; that the obtaining of members of any association costs approximately ten dollars apiece, and that by this arrangement a large number of members were added without expense, so that the payment of this claim, which is in fact a mortuary one, might be made out of the expense fund in lieu of paying a canvasser or deputy for accomplishing the same result.   We are not disposed to give this suggestion serious consideration.   To permit that to be accomplished indirectly which cannot be done directly is to encourage indirect and reprehensible means rather than open and fair dealing.   Besides this, we find no allegations in the petition upon which to base this claim.

It is further suggested that, even though this contract be *ultra vires*, still the Bankers' Union is estopped from so pleading.   Authorities are cited supporting the proposition that a corporation may be estopped from pleading the invalidity of its contracts as against one who has made part performance of such contract.   We are free to grant the correctness of the principle, but find no opportunity for its appli-

cation here, because there has been no part performance. There was no consolidation or merger; there could be none under the statute. No authority therefor is given. That 4000 of the members of the National Aid Association chose to become members of the Bankers' Union constituted no part performance on the part of the former association. It could not transfer a single member. Each individual acted for himself. The petition contains no allegation that any of the property of the National Aid Association ever came to the possession of the Bankers' Union. On the contrary, it does allege that all of the records and assets of the National Aid Association are in the hands of the receiver, Bird. Had the assets of the National Aid Association gone into the hands of the Bankers' Union, such assets, perhaps, in a proper action, could have been subjected to plaintiff's claim, but we do not see how an estoppel by reason thereof could be invoked in favor of Mrs. Crawford. She never has paid anything for or lost anything by reason of the agreement upon which she counts. We must hold that the agreement which is sought to be enforced is *ultra vires*, and that the Bankers' Union is not estopped so to assert it.

The case of *Twiss v. Guaranty Life Ass'n*, 87 Iowa, 733, 55 N. W. 8, 43 Am. St. Rep. 418, was very like the one at bar. The court, discussing the questions of *ulra vires* and estoppel, used the following language (p. 736) :

"That the making of the contract was in excess of the power of the appellant there should be no question. We need not set out the articles of incorporation or the by-laws. It is enough to say that the contract, so far as it attempts to bind the appellant, is contrary to the whole scope and purpose of the corporation. The payment of these losses would be a

diversion of trust funds to other objects than those authorized by the charter, and would be a crime. Code, section 1072. Both of these companies were organized upon the assessment plan. The assessments were made quarterly, and a fixed amount was required to be paid. A certain amount was set aside for an expense fund, and the remainder was designated as the mortuary fund. The articles of the association explicitly provide as to the disposition to be made of these several funds. There is not one word in the whole record which, by the remotest implication can be construed as authorizing the secretary, or even the board of directors, to use any part of the proceeds of these quarterly payments for such a purpose as paying the death losses of any other insurance company. It is unnecessary to further discuss this question. It appears to us that the undertaking to pay the losses of the Guaranty company is plainly in excess of the power of the appellant or any of its officers. The facts of the case bring it within the rules announced in *Lucas v. White Line Transfer Co.*, 70 Iowa 542 [30 N. W. 771, 59 Am. Rep. 449] ; *Davis v. Old Colony Railway Co.*, 131 Mass. 258 [41 Am. Rep. 221]. And see, also, 2 Morawetz on Private Corporations, sections 580, 581, 591, 607, 609.

"But it is claimed in behalf of the appellee that the contract is executed, and that the appellant is estopped from questioning its validity. As we have said, where an *ultra vires* contract is made and performed on one side, the other party cannot be permitted to enjoy the benefits received, but will be required in a proper action to account; in other words, the doctrine of a want of power to contract cannot be invoked to aid a party to perpetrate wrong and injustice. But this case presents no such features. It is conceded that the Guarantee company was bankrupt when the contract in question was made. Complaint had been made to the state auditor that it was not paying its death losses promptly, and it was unable to obtain a certificate authorizing it to continue in business. It is said by counsel for the

appellee, in argument, that for the payment of these death losses the Guaranty had no means whatsoever, except its annual premiums, payable in quarterly instalments. It had no certificate authorizing it to do business after March, 1889. The death losses had been such as to require the proceeds of the mortuary calls to meet the claim, and, in addition, had used up the reserve fund. It was in this condition when the insured, David M. Twiss, died, and the claim of the plaintiff accrued.

"It is urged with apparent confidence that, as there were some 567 members of the Guaranty company when it failed, the appellant should be required to pay its death losses upon the ground that by the contract it acquired some 400 new members. We have already said that the appellant was not authorized to buy members in this way and on any such terms. Let us see whether there is any ground for the alleged estoppel. If there is any reason for such a claim it must be because the appellant, by seeking a transfer of the membership, put it out of the power of the plaintiff to compel payment by the Guaranty company. The wrong and injury to the plaintiff, if any, consists in taking away the membership, so that the members did not pay their quarterly dues to the Guaranty company, by the payment of which the plaintiff would have received the amount due on the policy. It appears to us that this is a most unwarranted assumption. It is based upon the theory that, if the contract had not been made, the 567 members would have continued to pay quarterly instalments to the Guaranty company until all of the death claims were satisfied and all other claims paid. That this would have occurred is not only not probable, but highly improbable. - Members of such organizations are not more likely to pay money for nothing than other people. The fact is, the record shows beyond all question, that if the contract had not been made between the two companies the plaintiff's claim was absolutely worthless. That the position of the plaintiff was in any manner changed to her prejudice by the contract not

only does not appear, but the face of the transaction shows that it was not.''

Defendant in error insists that this case is not authority here, as it proceeds upon the assumption of antecedent bankruptcy of the absorbed association. We think there is no fair ground for drawing this distinction. It appears that the National Aid Association had forty-four uncontested and unpaid losses, amounting to $44,350, and nine contested ones, amounting to $7000, at the time of the making of this agreement; and, in the language of the petition, the officers of the association had then ''become convinced that on account of the low rate of assessment and the slow growth, . . . for the protection of its membership and to guarantee the payment of its death losses, it was necessary to combine with some other fraternal order; that it could not continue business and meet its death losses promptly.'' If this does not plead bankruptcy it pleads what is equivalent; for an association of this sort to declare that it could not meet its death losses promptly was to announce its death. (*Home Friendly Society v. Tyler*, 9 Penn. Co. Ct. Rep. 617; *Borgraefe v. Knights of Honor*, 26 Mo. App. 218, 223.)

Taking up the second question propounded above, and admitting that the agreement is within the power of the Bankers' Union to make, what would be Mrs. Crawford's right thereunder? It will be noted that the beneficiary certificate which is the basis of her claim does not provide for the absolute payment of the sum of $1000, but for only so much of it, up to that amount, as should be derived from an assessment made upon the members of the National Aid Association as provided in its by-laws. These by-laws are not pleaded, but we shall assume, however, that they

provide for an assessment upon all of the members of the association at the time of the death of the insured; so that all that Mrs. Crawford was entitled to thereunder was to have this assessment made, and to receive the proceeds of it up to the amount of $1000. The liability which the Bankers' Union assumed was that the provisions of this beneficiary certificate should be carried out according to the constitution and by-laws of the National Aid Association. Hence, at the very most, Mrs. Crawford would have only the right to have as assessment made upon the members of the National Aid Association and to receive the proceeds of such assessment up to the amount of her certificate. Beyond any question, this was an agreement *ultra vires*, for the Bankers' Union could not make an assessment upon the members of the National Aid Association. Mrs. Crawford has yet, so far as it now appears, all the rights she ever had under this certificate. She is entitled to have the officers make this assessment for her benefit and to receive its proceeds. We are fully persuaded that the agreement counted upon was beyond the power of the Bankers' Union to make, and that the same conferred no rights whatever upon Mrs. Crawford.

The judgment of the court below will be reversed, with direction to sustain the demurrer to the petition.

All the Justices concurring.