No. 30,251

THE STATE OF KANSAS, ex rel. ROLAND BOYNTON, Attorney General, *Plaintiff*, v. THE WHEAT FARMING COMPANY, *Defendant*.

(110 P. 2d 795)

Opinion on application for declaratory judgment filed March 8, 1941.

*E. R. Sloan,* of Topeka, for the secured stockholders.

*C. P. Schenck,* of Topeka, for the preferred stockholders.

The opinion of the court was delivered by

DAWSON, C. J.:   The defendant corporation is in a receivership (*State, ex rel., v. Wheat Farming Co.,* 137 Kan. 697, 22 P. 2d 1093),

the duration of which has been protracted owing to litigation in the federal courts (*Lillard v. Lonergan,* 72 F. 2d 865; id., 293 U. S. 615, 79 L. Ed. 704), and by financial difficulties and other complications of its business affairs, and by the presently unmarketable character of its fragmentary assets which chiefly consist of western Kansas lands.

The particular matter of present concern pertains to the claims of some "secured" common stockholders which are resisted by the preferred stockholders, to an understanding of which the facts must be stated at some length.

It appears that prior to September 28, 1927, the nominal capital stock of defendant was $150,000, divided into fifteen hundred shares of $100 each. Whether any such stock had been issued does not appear, but if so it can be presumed that it was surrendered and canceled. On that date the incorporators or stockholders adopted a resolution which provided that the capital stock should be divided into 150,000 shares of no par value "to be sold not to exceed one dollar per share." This resolution of September 28, 1927, was filed as an amendment to the charter and approved by the state charter board on January 5, 1928.

On January 17, 1928, a resolution of the stockholders was adopted which provided for *an increase of its capital* by an issue of 3,000 shares of preferred stock of the par value of $100 per share, the dividends of which should not exceed 7 percent, and having the usual preferential participation in the assets of the company in case of insolvency or dissolution. This amendment was approved by the charter board on January 18, 1928.

Pursuant thereto, and upon some showing to the bank commissioner, on February 29, 1928, a blue-sky permit was issued which authorized defendant to sell its common stock of no par value and 3,000 shares of preferred stock on the following terms:

"Common stock to be sold at a price of not to exceed $20 per share, preferred stock to be sold at a price of $100 per share. All stock to be sold for cash, or at least one-half cash, the balance in bankable notes . . . or, to exchange said stock at the prices above named for real estate or exchange for the necessary equipment to develop the business of the company, and to pay a commission of not to exceed 20 percent of the cash actually received by the company payable only as and when such cash is received. This commission to include all overhead expenses for the sale of said stock."

Under this permit, between March 3 and April 20, 1928, defendant sold 955.5 shares of its common stock at $20 per share. Be-

tween April 20 and August 1 it sold 3,113.9 shares of common stock at $20 per share in cash or its equivalent in property. To effectuate many of these sales the defendant devised and put into effect a scheme whereby certain purchasers of common stock at $20 per share received a guaranty that out of every $20 it would invest $6 thereof in investment certificates of various building and loan associations and deposit these with a bank in Kansas City, Mo., which agreed to act as escrow holder thereof; and defendant agreed with the purchasers thus favored that if in twenty years they did not receive in dividends a return of as much as the entire purchase price of their stock, the proceeds of such building and loan certificates held in escrow in the Missouri bank would be devoted to make up any shortage in such anticipated aggregate of dividends.

Many sales of common stock were made by defendant pursuant to the foregoing arrangement. Elaborate documents having as many asservations of fidelity as a negotiated peace with Hitler were executed by the purchasers favored with these attractive inducements— by the defendant company, and by the Kansas City, Mo., escrow holder. Of the common stock sold prior to April 20, 1928, the purchasers of 805.5 shares at $20 per share were given this special guaranty or security so called, and the purchasers of 150 shares at the same price received no such guaranty. Between April 20 and August 1, 1928, the purchasers of 1,661 shares of common stock were given this special guaranty, and the purchasers of 1,452.9 shares at the same price did not receive it.

The records of the corporation do not show any authorization for such an unusual discrimination between the purchasers of defendant's common stock, and of course it was never given the sanction of the blue-sky board. What the minutes of the corporation do show is the following resolution of the board of directors, dated July 21, 1928:

"The matter of the guarantee for the common stock was brought up for consideration and after discussion it was decided to take off the guarantee beginning with August 1 and that after that date all common stock be sold without the guarantee."

At the invitation of this court, counsel for the "secured" common stockholders and counsel for the opposing preferred stockholders have filed briefs on the legal questions involved, and an order must now be made directing the receivers as to the proper disposition of these building and loan investments or their proceeds as corporate

assets of the defendant. It is obvious, of course, that if their proceeds are applied to the satisfaction of the guaranty given to the favored purchasers of its common stock, the capital assets of the company will be diminished to that extent; and there will be just so much less to distribute to the other stockholders when the corporation is completely wound up. The preferred stockholders have a prime interest in a correct decision of the legal question presented, for they may reasonably hope for an eventual partial return of their investment—however remote a like prospect may be for the holders of the common stock who were not favored with defendant's guaranty.

On behalf of the "secured" stockholders, it can fairly be said that so far as the record reveals they did not know that they were given any guaranty or inducement to purchase the stock which was not accorded to all other purchasers of similar stock.

While the charter as amended by resolution of December 28, 1927, and approved by the state charter board on January 5, 1928, provided that the common stock was to be sold at "not to exceed one dollar per share," the same state authority on February 29, 1928, gave defendant a permit to sell its common stock at a price "not to exceed $20 per share," so we do not attach any present significance to the conflict between the provision of the charter and the terms of the blue-sky permit insofar as the selling price of the stock is concerned.

But what a corporation may lawfully do with the proceeds of the sales of its corporate stock is a matter of first importance to all concerned—to the state which sanctioned the creation of the corporation and defined its powers, and to its creditors, and ultimately to its stockholders. This defendant corporation had no authority to invest the proceeds of the sales of its treasury stock in the building and loan certificates of another corporation. As the law stood when the frenzied financiering of this defendant was being conducted, no corporation could invest in or otherwise acquire the securities of another corporation except for the purpose of protecting itself against loss. (R. S. 17-603, G. S. 1935, 17-603; *Scott v. Bankers' Union,* 73 Kan. 575, 584-586, 85 Pac. 604; *Sarbach v. Fiscal Agency Co.,* 86 Kan. 734, 122 Pac. 113; *A. O. U. W. v. Hobbs,* 136 Kan. 708, 709, 18 P. 2d 561; *Central Life Securities Co. v. Smith,* 236 Fed. 170; 14a C. J. 577; 7 R. C. L. 526-530.)

The original treasury stock of a corporation exists solely for the

purpose of being sold to create a fund to be permanently devoted to the legitimate purpose for which its charter was granted. Consequently, any collateral agreement between defendant and a purchaser of such stock that part of the purchase price—as $6 out of every $20—instead of becoming part of the corporation's regular capital assets would be immediately diverted to another purpose entirely, that is, to the purchase of building and loan certificates of another corporation, and so remain for a period of twenty years, and that thereafter such extraneous investment or its proceeds would be devoted to make up any shortage in the anticipated dividends accruing to the favored purchasers of such stock, was illegal and void. (*Bankers' Union v. Crawford,* 67 Kan. 449, 73 Pac. 79, 100 A. S. R. 465; *Sarbach v. Fiscal Agency Co.,* supra; *Wheat Growers Ass'n v. Rowan,* 125 Kan. 710, 266 Pac. 101; *Norton v. Lamb,* 144 Kan. 665, 669, 62 P. 2d 1311; 13 Am. Jur. 349; id., 772; 18 C. J. S. 810; 4 Thompson on Corporations, 3d ed., § 2825, p. 525; Ballantine's Manual of Corporation Law, 205.) And see the analogous cases of *Smith et al. v. Alabama Fruit Growing & Winery Ass'n et al.,* 123 Ala. 538, 26 So. 232; and *Jorguson v. Apex Gold Mines Co.,* 74 Wash. 243, 133 Pac. 465.

On behalf of the secured stockholders it is argued that the favored position given them by the collateral agreement was not a fraud on anyone. Why not? It unlawfully diverted a substantial portion of the cash capital of the defendant corporation. Every dollar of that cash capital is sorely needed now to minimize the losses of the stockholders who in good faith put their money in this ill-starred concern, and who had a right to assume that all the proceeds of the sales of the company's treasury stock would be honestly devoted to the authorized business of the corporation. The case of *Mitchell v. Beachy,* 110 Kan. 60, 202 Pac. 628, is cited. But in that case it was sought to correct the misdeeds of the corporation and its officers by persons who had parted with their interest in the corporation. This corporation is in *custodia legis* for the correction of its misdeeds, on the initiative of the state, and for the benefit of all concerned. (4 Thompson, *supra,* § 2900, p. 605.)

Recurring to the point that the charter as amended prescribed the selling price of the nonpar stock at "not to exceed one dollar per share," whereas it was sold for $20 per share. It may be that there was a time when subscribers who paid $20 per share might have had an action to recover the excess (11 Fletcher, Cyc. Corp., Perm. ed.,

§ 5252), but such recourse, if any, has long been barred by lapse of time.

The application of the secured stockholders that the proceeds of the building and loan investments of defendant be applied in accordance with the aforesaid guaranty is denied, and the receivers are directed to place the same in the general assets of the company to be disbursed or distributed as provided by law.