No. 80,274

THE KANSAS EAST CONFERENCE OF THE UNITED METHODIST CHURCH, INC., *Appellant/Cross-appellee,* v. BETHANY MEDICAL CENTER, INC., *Appellee/Cross-appellant,* and STATE OF KANSAS, *Appellee.*

(969 P.2d 859)

Opinion filed December 11, 1998.

*Stewart L. Entz,* of Entz & Chanay, P.A., of Topeka, argued the cause, and *Jeffrey A. Chanay* and *Michael L. Entz,* of the same firm, and *Kris W. Kobach,* of Kansas City, Missouri, were with him on the briefs for appellant.

*Reid F. Holbrook,* of Holbrook, Heaven & Osborn, P.A., of Kansas City, argued the cause, and *Thomas M. Sutherland, Daniel W. Peters,* and *Lynaia M. Holsapple,* of the same firm, and *Robert T. Stephan,* of Lenexa, were with him on the briefs for appellee/cross-appellant Bethany Medical Center, Inc.

*David E. Everson,* of Stinson, Mag & Fizzell, P.C., of Kansas City, Missouri, argued the cause, and *Carrie L. Mulholland,* of the same firm, *Carla J. Stovall,* attorney general, and *John W. Campbell,* senior deputy attorney general, were with him on the brief for appellee State of Kansas.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an action for declaratory judgment brought by the Kansas East Conference of the United Methodist Church, Inc., (the Conference) seeking an order that would dissolve Bethany Medical Center, Inc., (Bethany) and distribute its assets, which consist primarily of the hospital sale proceeds, to the Conference. After a bench trial, the district court entered judgment that Bethany should not be dissolved. On cross-claims between Bethany and the State of Kansas, the trial court ordered that

Bethany use the proceeds to promote and improve the health of the citizens of Wyandotte County, Kansas, particularly the indigent. On its own motion, the trial court issued a permanent injunction prohibiting Bethany from amending its articles of incorporation to remove the Conference as the designated recipient of Bethany's assets in the event of its dissolution. The Conference appealed from the decision permitting Bethany's continued corporate existence and retention of the sale proceeds. Bethany cross-appealed from imposition of the permanent injunction. The case was transferred from the Court of Appeals to this court on the Conference's motion, pursuant to K.S.A. 20-3017.

In its findings of fact, the district court stated:

"Bethany Medical Center is a not-for-profit charitable corporation, organized, existing, and in good standing in the State of Kansas. It is a tax exempt, § 501(c)(3) corporation, pursuant to the Internal Revenue Code of 1954. Furthermore, it is exempt from payment of real and personal property taxes pursuant to K.S.A. 79-201(b). Bethany is a general hospital, as contemplated by K.S.A. 65-425(a). It is a health care provider within the meaning of K.S.A. 40-3401 *et seq.*

"Bethany is a charitable organization pursuant to the Charitable Organizations and Solicitations Act [COSA], K.S.A. 17-1759 *et seq.*, and is an 'institution' as contemplated by the Uniform Management of Institutional Funds Act, K.S.A. 58-3601 *et seq.* Bethany has several for-profit corporate subsidiaries, all doing business in the State of Kansas and in good standing. They are Medical Management, Inc., (MMI); Medical Professionals, Inc., (MPI); and General Collection Services, Inc., (GCSI).

"The [Conference] is a not-for-profit charitable corporation, duly organized, validly existing, and in good standing in the State of Kansas. It is also a charitable organization as contemplated by COSA.

"On July 28, 1997, Bethany executed an asset purchase agreement with Galen [of Kansas, Inc.,] wherein Bethany agreed to convey most of its assets to Galen in return for a cash payment and assumption of certain liabilities by Galen. Bethany will retain cash and other marketable securities. It is estimated now that their value will be somewhere between \$40-45,000,000. That figure is subject to final calculations and adjustments and the satisfaction of certain debts and obligations that Bethany has, including some industrial revenue bonds to Kansas City, Kansas.

"This court found, on September 26, 1997, that it was an economic necessity for Bethany to enter into the sale."

Following the trial court's decision that the hospital should be sold, the sale took place. It is not challenged on appeal.

The trial court also detailed the historical relationship between Bethany and the Conference. According to the district court's account, the 1892 charter of Bethany declares that its medical purpose is

" 'to nurse and furnish medical treatment for the sick and wounded . . . and for that purpose to rent, build and maintain, in or near Kansas City, Wyandotte County, Kansas, a hospital in which indigent patients may be treated and nursed, under such rules and conditions as the Board of Directors may prescribe; but pay may be accepted from such persons as may be able and willing to render the same, and all receipts from that source shall be expended for the use and benefit of the hospital . . . .' "

Charitable contributions to support the operation of the hospital were solicited by Bethany, by a charitable foundation Bethany formed for the purpose of soliciting contributions, by the Bethany auxiliary, and by the Methodist church. "Bethany was not created for the benefit of the Methodist Church, but was one of its missions."

Until 1972, the Conference elected a majority of the trustees to Bethany's Board of Trustees (Board). In 1972, Bethany's articles of incorporation were amended to provide that 12 of the 15 Board members should be elected by the outgoing Board and confirmed by the Conference. "The Kansas City District Superintendent of the Conference was designated by title to be a member of the Bethany Board."

As the result of litigation which concluded in 1979 with the California Conference of the Methodist Church being held accountable for the activities of a Methodist-related retirement facility, the Conference became concerned about being held liable for Bethany's activities. The Conference referred the question of legal separation from Bethany to a study committee. At the recommendation of the study committee, Bethany's articles of incorporation were changed to erect a wall between it and the Conference: The requirement that Bethany's Board be confirmed and ratified by the Conference was deleted; the Conference's right to veto nominations for Bethany's Board was deleted; and the condition that Bethany's articles of incorporation and amendments to them were

not effective until ratified by a majority of the Conference at its annual conference was lifted.

In time, the Conference put more distance between itself and Bethany, as is reflected in the following excerpt from the 1983 journal of the Conference:

"'Bethany Medical Center, Inc., Kansas City, Kansas, [and others] . . . [are] wholly independent institutions from the Kansas East Annual Conference. The Annual Conference shall not elect or approve the entire Board of Trustees though it may from time to time elect less than a majority of its Trustees or send Conference visitors. The Annual Conference shall not monitor, supervise, or, otherwise, review any of the affairs or operations of these institutions. The Annual Conference may, from time to time, provide financial support to any of these institutions as a contribution. The Annual Conference shall have no legal responsibility for any of these institutions.' "

The Conference has donated no money to Bethany since 1975. In July 1980, the Conference passed along to Bethany two contribution checks totalling $25.

Bethany's revenues for the year ending September 30, 1996, exceeded $73 million.

Bethany's current articles of incorporation permit its Board to amend them without restriction. It also provides: "Upon dissolution of the Corporation and after payment of just debts and liabilities, all remaining assets shall be distributed to the Kansas City East Conference of the United Methodist Church . . . ."

Bethany's corporate purpose is stated as follows in the current articles of incorporation:

"a. To establish and maintain an institution within or without the state where incorporated, with permanent facilities that include inpatient beds and medical services to provide diagnosis and treatment for patient and associated services such as, but not limited to, extended care, outpatient care, and home care;

"b. To carry on any education activities related to rendering care to the sick and injured, or to the promotion of health that, in the opinion of the Board of Trustees of Bethany Medical Center may be justified by the facilities, personnel, funds, and other requirements that are, or can be, made available;

"c. To promote and carry on scientific research related to the care of the sick and injured insofar as, in the opinion of the Board of Trustees of Bethany Medical Center, such research can be carried on, in, or in connection with the hospital; and,

"d. To promote and participate, so far as circumstances may warrant, in any activity designed and carried on to promote the general health of the community."

With regard to the sale of Bethany, the district court stated the following:

"Under the purchase agreement, Bethany has continuing rights and obligations. It has the right to enforce agreements with Galen to continue the operation of the hospital for at least three years after closing, and to continue Bethany's indigent care policies for so long as Galen operates an acute care hospital in Wyandotte County, and they have certain rights of first refusal and repurchase options with respect to the hospital for a period of five years."

The trial court's final judgment consisted of three rulings:

(1) On the Conference's petition for declaratory judgment, the trial court refused to order dissolution of Bethany and, thus, permitted Bethany to retain the proceeds of the sale.

(2) On the cross-claims of Bethany and the State, the trial court decided that Bethany's use of the proceeds is restricted to improving the health of Wyandotte County citizens, particularly indigent ones.

(3) On its own initiative, the trial court permanently enjoined Bethany from displacing the Conference as the recipient of Bethany's assets in the event of its dissolution.

The Conference appeals the first ruling; Bethany cross-appeals the third ruling. We first consider the issue raised in the Conference's direct appeal.

This court's review of the trial court's conclusions of law is unlimited. *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991).

The district court described the arguments made by the Conference and Bethany as being like ships, on two completely separate courses, passing in the night. The Conference would have had the trial court apply trust law, and Bethany relied on corporate law. The trial court expressly concluded that the law of corporations governs the question. On appeal, the Conference persists in its advocacy of trust law as governing this issue but gives no reasons why trust law rather than corporate law ought to be applied. Instead, the Conference devotes nearly all the argument section of

its brief to convincing this court that proper application of trust law will lead to reversal of the judgment.

The Conference states what it seeks on appeal: "[T]he Conference respectfully submits that the decision below must be reversed, and that the Conference be found entitled to all of Bethany's assets." What the Conference centers its argument on, however, is not entitlement to the sale proceeds. Instead, it focuses on the trial court's imposing restrictions on *Bethany's* use of the proceeds. The restrictions, which were imposed in the trial court's ruling on the cross-claims *between Bethany and the State*, were not a subject of the Conference's petition for declaratory judgment, nor do they affect the Conference, nor are they even at issue on appeal. The theory behind the Conference's focusing on an extraneous question seems to be, at least in part, to invoke principles of trust law with regard to the restrictions and then seamlessly turn them toward the question of entitlement to the sale proceeds. In this regard, the Conference broadly states that the trial court "correctly observed that the law and principles of charitable trusts govern the *disposition* of Bethany's assets." (Emphasis added.) The Conference then quotes a portion of the journal entry that pertains to the question of restrictions, not the question of entitlement.

The Conference does not address why corporate law, which was applied by the trial court, does not control. The district court found that Bethany is a not-for-profit, charitable corporation, organized, existing, and in good standing in the state of Kansas. It further found that Bethany is a charitable organization pursuant to the Charitable Organizations and Solicitations Act (COSA), K.S.A. 17-1759 *et seq.*, The subject of Chapter 17 of the Kansas statutes is corporations, and Article 17 of the corporations chapter contains provisions specific to religious, charitable, and other organizations. K.S.A. 17-1701 to 17-1775. Articles 60 through 77 constitute the general corporation code. K.S.A. 17-6001 provides, in part: "[A]ny corporation organized under the laws of this state or authorized to do business in this state shall be governed by the applicable provisions of this code." Thus, as a charitable corporation organized under the laws of Kansas, Bethany is governed by the Kansas Corporation Code.

The Conference directs the court's attention to Restatement (Second) of Trusts § 348 Comment f (1957) as authority for applying the same rules to charitable trusts and charitable corporations. What the Comment actually states is that some of the rules applicable to charitable trusts are applicable as well to charitable corporations and some are not. In any event, the Comment has little or no relation to the circumstances of the present case because the Comment (and the Restatement section) contemplates a settlor or donor manifesting an intention to create a charitable trust and devoting property to accomplish the charitable purpose. Bethany's history is replete with charitable giving, but it does not include the particular elements of a charitable *trust*, as defined in § 348. According to the Conference, Bethany was founded in 1892 by five Methodists as a part of "the Methodist hospitalization movement," it was incorporated the same year, "[t]he Conference was the initial sponsor of the hospital," the Conference "was a conduit through which individuals attending Methodist Churches in eastern Kansas could donate funds to help fulfill Bethany's mission," and "[c]ountless donors, individual and corporate, have donated money throughout the years to the [Conference] for Bethany."

What the Conference seeks to convey to the court is that it is or is like a donor or settlor with the legal authority to reclaim its gift once the specified use is accomplished or obsolete. There is nothing in the record, however, to substantiate that construct. This is not a case in which a donor put money in a trust to be used for the creation and financial support of a hospital. Instead, it is a case where five Methodists incorporated in 1892 for the purpose of providing medical care in Wyandotte County, solicited charitable contributions, formed a foundation to solicit contributions, and accepted contributions from the Methodist church. Over the years, the Conference has been closely associated with Bethany and has been a significant benefactor, but there is no evidence of its acting as a trust settlor. Because Bethany is a corporate entity and held the title, Galen purchased the hospital from and paid Bethany for it. The theory which the Conference has formulated for its entitlement to the sale proceeds, therefore, involves disqualifying the Bethany corporation. The Conference seeks to do so on the ground

that Bethany can no longer fulfill its purpose, which in the Conference's construct is synonymous with the donor's intent. There is no factual basis for what the Conference proposes, and, in addition, dissolution of Bethany is governed by the corporate statutes.

The Conference wants the hospital sale proceeds, which are held by the Bethany corporation. Thus, the Conference's theoretical entitlement to the proceeds depends upon Bethany's corporate dissolution. Corporate dissolution is governed by provisions of the corporation code, not by trust principles. The Conference seeks dissolution of Bethany, not just a declaration of legal rights.

The Conference also argues that a corporation must have a purpose and is prohibited from conducting any activity outside its stated purpose. The Conference quotes from the journal entry to show that the parties agreed and the district court found that Bethany's *primary* purpose had been to operate a hospital. In selling the hospital to Galen, the Conference argues, Bethany "contracted away its purpose." Bethany is forbidden by law to substitute other activities, and, therefore, the argument continues, the corporation must be dissolved. The Conference relies on *Bankers' Union v. Crawford*, 67 Kan. 449, 73 Pac. 79 (1903), and *Attorney General v. Hahnemann Hospital*, 397 Mass. 820, 494 N.E.2d 1011 (1986).

The Kansas case turns on the peculiarities of fraternal benefit societies. Statutory and practical constraints on the charitable organizations involved in the present case are not comparable to those that controlled the activities of the fraternal benefit societies. It is clearly distinguishable on its facts, and it has no precedential value in the present case.

The Massachusetts case, like the present one, involved the sale of a hospital, which was operated by a charitable corporation, to a for-profit corporation. The Massachusetts court stated:

"The Attorney General argues that Hahnemann's abandonment of its sole activity is, in effect, a dissolution requiring compliance with the § 11A procedures. Hahnemann responds that it does not intend to close its affairs, but instead will become a grant-making institution in accordance with its newly amended corporate purposes.

"There can be little doubt that, in the absence of amendment of its purposes, the abandonment by Hahnemann of the sole activity authorized by its articles of organization—maintaining a hospital—would render Hahnemann an empty shell,

unable to fulfil its purposes. [Citation omitted.] In that instance, a dissolution proceeding under § 11A would be required.

"In this case, however, Hahnemann has amended its articles of organization to include '[e]stablishing, maintaining, and supporting a charitable hospital or hospitals,' and 'a convalescent home or homes,' and '[p]articipating in any activity that promotes the health of the general public.' Hahnemann represents that it intends to function as a grant-making institution to fulfil these purposes. There is no suggestion that the amendments are invalid or that the newly stated purposes are unattainable. Hahnemann is not winding up its affairs, and need not do so as a matter of law." 397 Mass. at 833.

In the present case, Bethany's primary purpose was operating a hospital, but operating a hospital was not its sole activity. Even if it had been Bethany's sole activity, however, the lesson from *Hahnemann* would be that the effect of the sale on Bethany is governed by the corporation code.

*Hahnemann* is an instructive case in other respects. In 1892, Hahnemann was organized as a nonprofit, charitable corporation for the purpose of establishing and maintaining a hospital in accordance with the principles of homeopathy. When a hospital finally was built, more than 40 years later, the funds were supplied by an inter vivos charitable trust established by Mary Ida Converse for the support of a homeopathic hospital. Subsequent operation of the hospital relied on contributions from the Converse trust income, and on three occasions the trust instrument was amended to provide payments out of trust principal for "maintenance, operation, expansion, and modernization." 397 Mass. at 824. Thus, the issues presented by Hahnemann's sale "require[d] a detailed examination of the relationship between the terms of the Converse trust and the articles of organization of the Hahnemann corporation." 397 Mass. at 825. In *Hahnemann*, the money that made realization of the corporate objective possible was supplied by an independent charitable trust, the provisions of the trust instrument had been incorporated into the corporation's by-laws, and trust principles were taken into consideration by the Massachusetts court. It concluded that the proposed hospital sale would not necessitate dissolution where the corporate articles had been amended to create new corporate purposes. In the present case, there is no independent charitable trust. Nonetheless, the Confer-

ence would have this court apply trust principles and conclude that the hospital sale necessitated dissolution where the corporate articles, without amendment, included other corporate purposes. The comparison of *Hahnemann* and the present case undermines rather than enhances the Conference's position.

The Conference's claim to the sale proceeds depends on Bethany's dissolution. As the district court stated, "[c]orporations are creatures of statute" that "are born and die through an operation of law." K.S.A. 17-6805(a) provides that the method and proceedings for the dissolution of a corporation such as Bethany that has no capital stock "shall conform as nearly as may be possible to the proceedings prescribed by K.S.A. 17-6804, and amendments thereto, for the dissolution of corporations having capital stock." In order to accomplish dissolution, a majority of the members of the governing body adopt a resolution to dissolve the corporation, and a certificate of dissolution is filed with the Secretary of State. The Secretary of State issues its own certificate. When that certificate is recorded in the office of the register of deeds of the county in which the corporation maintained its registered office, the corporation is dissolved. K.S.A. 17-6804(b). None of the steps in this process has been undertaken by Bethany.

In the absence of any inclination on the part of Bethany's Board to dissolve the corporation, the Conference sought to have the district court intervene to judicially dissolve the corporation and distribute its assets—the proceeds from the hospital sale. Neither the Kansas case nor the Massachusetts case relied on by the Conference supports its desired result.

Bethany cites *Cron v. Tanner*, 171 Kan. 57, 229 P.2d 1008 (1951), in which a minority shareholder sought a writ of mandamus against the officers and directors of a banking corporation to compel retirement of certain stock, payment of a dividend on other stock, and repayment of a dividend and salary to a certain officer. Although Cron did not seek to have the court intervene to dissolve the corporation, the court made the following general observations:

"It is well settled that the directors of a corporation are charged with the duty of managing its affairs and only in cases of the greatest emergency are courts warranted in interfering with the internal operation of its affairs. It has been said

that the fundamental principle of a corporation is that a majority of its stockholders have the right to manage its affairs so long as they keep within their charter and no principle of law is more firmly fixed in our jurisprudence than the one which declares that courts will not interfere in matters involving merely the judgment of the majority in exercising control over corporate affairs. (*Feess v. Bank*, 84 Kan. 828, 115 Pac. 563, LRA 1915A, 606; *Beard v. Achenbach Memorial Hospital Ass'n*, 170 Fed. 2d 859.)" 171 Kan. at 62.

Bethany also cites *Feess v. Bank*, 84 Kan. 828, 115 Pac. 563 (1911), which this court relied on in *Cron* and the trial court relied on in the present case. *Feess* also involved a bank and a complaining minority shareholder. On an ex parte application and without notice to other stockholders and the directors, the trial court appointed a receiver, placed possession of the assets and business of the bank in him, and ordered him to wind up the bank's affairs, "thus practically end[ing] its corporate existence." 84 Kan. at 834. Following a discussion in which the lack of notice was disapproved, the court added that "the appointment that was made would not have been justified even if notice had been given." 84 Kan. at 834. The court's observations continued:

"The court was without authority to make the order, and indeed there was no application for such an order in the petition on which the order was granted. There is nothing in the statute which authorizes a court of equity to dissolve a corporation, or wind up its affairs, at the instance of a minority stockholder, and in the absence of express statutory authority it can not be done. For certain reasons and by certain methods the bank commissioner is authorized to have a receiver appointed and to wind up the affairs and business of a bank. (Laws 1908, ch. 14, § 1, Gen. Stat. 1909, § 487.) A corporation may be dissolved, its franchise taken away, its affairs wound up and its property distributed in an action brought by the state through its proper officer, but a court of equity can not interpose its authority to forfeit the franchise of a corporation, wind up its affairs or otherwise end its corporate existence at the instance of a stockholder." 84 Kan. at 834-35.

Bethany states that the three circumstances which warrant a court's intervening to dissolve a corporation are set out in K.S.A. 17-6812(a) (abuse or nonuse of corporate powers), K.S.A. 17-6804(d) (deadlock of two stockholder corporations), and K.S.A. 17-6901 (insolvency). None of these circumstances exists in the present case.

It is not a question of a lack of judicial authority so much as whether circumstances warrant dissolution of Bethany. The Conference insists that Bethany has no purpose now that the hospital has been sold and that the lack of purpose requires dissolution of the corporation. As we have seen, however, operating a hospital was the primary purpose, but only one of several health-care related purposes pursued by Bethany. Sale of the hospital, therefore, did not drain the corporation of purpose.

Within the context of its corporate purpose argument, the Conference contends not only that the sole purpose of Bethany was to operate the hospital but also that the district court erroneously applied the Uniform Management of Institutional Funds Act (UMIFA), K.S.A. 58-3601 *et seq.*, to alter that purpose. The district court invoked UMIFA, not to change the corporate purpose but, rather, to release any restrictions that may have been placed by donors on contributions Bethany has received during the many years of its existence. Although the Conference takes the position that it is the donor that funded Bethany's activities, the record shows and the district court determined that the Conference was a conduit for contributions from many sources, including Methodist churchgoers, rather than the donor. The district court made no specific finding or findings about restricted donations; it simply invoked UMIFA to transform any restrictions there might have been that were rendered obsolete by the sale of the hospital. Even assuming for the purpose of argument that there were contributors who restricted donations they made to Bethany, those individually restricted donations are not to be confused with the purpose of the charitable corporation of Bethany. Thus, the district court's application of UMIFA is not relevant to the question of whether Bethany or the Conference should receive the proceeds of the sale. The district court correctly refused to dissolve Bethany and distribute its assets to the Conference.

We next turn to the issue raised in the cross-appeal: Did the district court abuse its discretion in permanently enjoining Bethany from amending its articles of incorporation to remove designation of the Conference as recipient of Bethany's assets upon its dissolution? The granting of injunctive relief involves the exercise of

judicial discretion and will be reviewed by this court for abuse of discretion. *South Shore Homes Ass'n v. Holland Holiday's*, 219 Kan. 744, 751, 549 P.2d 1035 (1976). A party that asserts abuse of discretion bears the burden of showing it. *State v. Harris*, 262 Kan. 778, 785, 942 P.2d 31 (1997). Here, Bethany asserts that the district court abused its discretion and, in doing so, violated Bethany's constitutional right to due process. In this circumstance, it has been said that

"there is a greater need for articulation by the trial judge of the reasons for his 'discretionary' decision. Discretion must be exercised, not in opposition to, but in accordance with, established principles of law. It is not an arbitrary power. In its practical application in this state, judicial discretion is substantially synonymous with judicial power." *Saucedo v. Winger*, 252 Kan. 718, 731-32, 850 P.2d 908 (1993).

The injunction in this case was entered by the trial court on its own initiative. The final two paragraphs of the journal entry state the trial court's reasons:

"Furthermore, this court is not convinced that Bethany should be allowed to amend its [articles of incorporation] to delete the [Conference] as the resultant beneficiary upon the dissolution of the corporation. This court believes this for two reasons. First, one cannot ignore eighty years of history. Without the [Conference] there would be no Bethany Hospital today. Countless donors, individual and corporate, have donated money throughout the years to the [Conference] for Bethany. During its corporate infancy, the [Conference] shielded and nurtured the hospital through good and bad times. Their gifts have made Bethany possible and should continue to be used for health care.

"Secondly, it must be assumed that the gifts made to Bethany [through] the [Conference] were made with the implied knowledge that in the event that Bethany dissolved, all of the net assets would revert to the [Conference]. See Bogert, Trusts & Trustees § 362. This is especially true of gifts made prior to 1982. Since there is no way to determine what portion of Bethany's assets were created through such gifts, the [Conference] should continue to be the reversionary beneficiary of Bethany's assets upon the event of its dissolution."

Bethany first contends that imposition of the injunction violated its due process right to notice and a hearing. It is axiomatic that the "[b]asic elements of procedural due process of law are notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *In re Marriage of Soden*, 251 Kan. 225, Syl. ¶ 4, 834 P.2d 358 (1992). In the present case, there is no dispute

that the Conference did not petition the trial court for an injunction, the trial court did not advise the parties that it was contemplating imposing an injunction, and the trial court did not hear any evidence on the question. Bethany had neither notice nor opportunity to be heard before the injunction was imposed. The sum of these factors equals a denial of due process.

The 5th and 14th Amendments to the United States Constitution guarantee that no person shall be deprived of life, liberty, or property without due process. The Conference argues that Bethany had no protected interest that would require notice and an opportunity to be heard. The Conference cites *Board of Regents v. Roth*, 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972), for the proposition that only *definite* liberty or property interests are protected. Roth was a first-year, untenured college teacher who challenged the decision not to rehire him for the next academic year. The Supreme Court held that Roth had no interest protected by due process. However, with regard to property interests, the Supreme Court stated:

"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." 408 U.S. at 577.

In the present case, Bethany argues that its property interest was created by the Kansas Corporation Code and that the dimensions of the interest include controlling the operations of the corporation and having freedom to alienate its property upon dissolution. K.S.A. 17-6301(a) provides that a corporation "shall be managed" by its board of directors, and K.S.A. 17-6805a provides:

"Notwithstanding any provision of law or the articles of incorporation, the articles of incorporation of each nonprofit corporation that qualifies otherwise for an exemption under section 501(c)(3) of the internal revenue code of 1954, as amended (26 U.S.C. § 501(c)(3)), shall be considered to contain the following provision:

"Upon the dissolution of the corporation, the board of directors or governing body of the corporation, after paying or providing for the payment of all liabilities of the corporation, shall dispose of all the assets of the corporation exclusively: (1) In accordance with the purposes of the corporation, in the manner determined

by the board of directors or governing body, or (2) to organizations qualified for exemption under section 501(c)(3) of the internal revenue code of 1954, as amended (26 U.S.C. § 501(c)(3)), and specified by the board of directors or governing body. Any assets of the corporation not so disposed of shall be disposed of by the district court of the county where the principal office of the corporation is then located, exclusively for the purposes or to the organizations provided above, as determined by the court."

The statutes, in particular 17-6805a, seem to create a definite property interest in the corporation's governing body's determining how the corporate assets are to be distributed. That statutorily created interest is in sharp contrast with the terms of Roth's appointment, which "secured absolutely no interest in re-employment for the next year." 408 U.S. at 578. Bethany has a property interest sufficient to require that it be given notice and a hearing before it could be deprived of the right to determine disposition of its assets. "It has been settled for almost a century that corporations are persons within the meaning of the Fourteenth Amendment. *Santa Clara County v. Southern Pacific R. Co.*, 118 U.S. 394[, 30 L. Ed. 118, 6 S. Ct. 1132] (1886)." *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 780 n.15, 55 L. Ed. 2d 707, 98 S. Ct. 1407 (1978).

The Conference argues:

"Bethany should have been aware of the possibility that the trial court would enjoin it from amending its [articles of incorporation] so as to remove the Conference as the recipient of its corporate assets upon dissolution. A portion of those assets are the very subject of this litigation, and it was entirely reasonable and predictable that the trial court would seek to preserve the rights and interests of the parties pending appeal."

In this regard, the Conference relies on *Penthouse Intern., LTD. v. Barnes*, 792 F.2d 943, 950 (9th Cir. 1986). To take advantage of some serendipitous publicity, Penthouse magazine wanted to republish photographs of Barnes, using her name rather than the pseudonym under which they originally appeared. In the magazine's declaratory judgment action, Barnes raised affirmative defenses and sought injunctive relief in her counterclaim; thus, Penthouse was aware of the possibility and had an opportunity to be heard on the issue of a mandatory injunction against publication using Barnes' name. The appellate court affirmed that part of the

judgment in which the district court ordered the magazine not to republish the photographs using Barnes' name. The appellate court vacated the order prohibiting the magazine from publishing the photographs at all because the district court had heard no evidence on the subject. The lessons from *Penthouse* are two sides of the same coin—where an enjoined party has had notice and an opportunity to be heard on the question of injunctive relief, it may be included in a declaratory judgment and *vice versa*. Thus, it offers no support for the Conference's position. The Conference asserts that Bethany should have anticipated an injunction because the corporate assets were the subject of the litigation. The argument, however, fails to take into account that the relief was unrequested and unbriefed and was not the subject of an evidentiary hearing; therefore, it was reasonably unforeseen.

The Conference also argues that the trial court had statutory authority in K.S.A. 60-901 for its *sua sponte* imposition of a permanent injunction as one aspect of the relief granted in the final judgment. Although K.S.A. 60-905(a) requires notice and an opportunity to be heard before imposition of a *temporary* injunction, the Conference's argument continues, 60-901 does not have similar requirements for *permanent* injunctions. K.S.A. 60-903 provides that a restraining order may issue upon ex parte application, but that the application "shall also be considered as an application for a temporary injunction" and that the restraining "order shall remain in force until the hearing on the application for a temporary injunction." K.S.A. 60-905(a) provides that "[n]o temporary injunction shall be granted until after reasonable notice to the party to be enjoined and an opportunity to be heard." There is no section that provides procedure for a permanent injunction, but we know from 60-901 that an injunction may be the final judgment in an action. In this three-tiered scheme, an application for injunctive relief inevitably will result in notice and an opportunity to be heard before a temporary injunction may be imposed and, therefore, certainly before a permanent injunction would be ordered. Thus, the absence of express statutory requirements for notice and hearing simply reflects the absence of a need to spell out requirements that ought to be fulfilled during the orderly processing of the case as a

whole. In the present case, there was no application for injunctive relief, and the possibility of injunctive relief was not considered in the ordinary course of the proceedings. The statutory scheme was bypassed by the trial court's *sua sponte* imposing an injunction as a part of the final judgment. Contrary to the Conference's contention, the statutes do not authorize issuance of a permanent injunction without notice to or opportunity for the enjoined party to be heard. In addition, the Conference's argument ignores the constitutional requirement of notice and an opportunity to be heard.

In the present case, the trial court stated that its authority for issuing the injunction on its own initiative lay in the declaratory judgment statutes. In K.S.A. 60-1701, K.S.A. 60-1704, and K.S.A. 60-1707 the trial court found "authority and obligation . . . to remove any uncertainty that the [Conference] and Bethany might have with respect to gifts made to Bethany through the Methodist Church prior to their 'separation.' " Examination of those provisions reveals no authority for the trial court's acting on its own initiative without notice to the parties and without affording an opportunity for the enjoined party to be heard. Bethany suggests that the trial court should have looked to K.S.A. 60-1703, which provides:

"Further relief based on a declaratory judgment may be granted whenever necessary or proper. The *application shall be by petition* to a court having jurisdiction to grant the relief. If the application is sufficient, the court, on *reasonable notice*, shall require any adverse party whose rights have been adjudicated by the declaratory judgment, *to show cause* why further relief should not be granted." (Emphasis added.)

It may be noted that the federal counterpart to K.S.A. 60-1703, 28 U.S.C. § 2202 (1994), was cited by the Ninth Circuit Court of Appeals in *Penthouse* as the source of authority for the trial court's enjoining the publication from using Barnes' name.

Bethany cites *Sampel v. Balbernie*, 20 Kan. App. 2d 527, 530-31, 889 P.2d 804 (1995), for the proposition that the party seeking injunctive relief has the burden of showing (1) a reasonable probability of irreparable injury, (2) an inadequate remedy at law, (3) relative hardship greater for the movant than for the adversary, and (4) compatibility with public interest. In *Sampel*, the Court of Ap-

peals relied on *Mid-America Pipeline Co. v. Wietharn*, 246 Kan. 238, 242, 787 P.2d 716 (1990). Taken together, these cases teach that injunctive relief is equitable in nature and that a substantial showing is required before a court is warranted in ordering a party to do or refrain from doing a certain act. With the trial court's including an injunction in the journal entry of judgment in the present case without notice to the parties, there was no opportunity for introduction of evidence for or against it. On cross-appeal, Bethany contends that the record lacks sufficient evidence on the factors identified in *Sampel* and *Mid-America Pipeline*. We agree.

Finally, Bethany argues that the injunction is contrary to public interest in two ways. First, it usurps the power granted to the corporation's Board by the legislature. Second, it "deprives the citizens of Wyandotte County of charitable funds meant for their benefit." The second contention is a hollow one. Without the injunction, Bethany could designate a recipient that would spend the assets outside the county. The Conference contends that the injunction protects public interest by ensuring that the charitable corporation honors the intent of its benefactor. As we have seen, though, the "donor's intent" that seems so obvious to the Conference is not substantiated in the record. It is apparent that the Conference *wants* control of the proceeds from the hospital sale, but there is no evidence from which it reasonably may be inferred that contributions were made with the intent that they would be returned if Bethany's operation of a hospital became impracticable.

The resolution of Bethany's cross-appeal is affected by our decision in the direct appeal by the Conference. We have approved the district court's refusal to dissolve Bethany, ruling that a corporation is a creation of statute and dissolution is controlled by the Kansas Corporation Code. Notwithstanding that ruling, the district court proceeded to control the future operation of Bethany by enjoining it from amending its articles of incorporation. In our earlier discussion affirming the trial court's refusal to dissolve Bethany, we quoted from *Cron v. Tanner*, 171 Kan. at 62, the well-settled rule that absent "the greatest emergency," courts are not warranted in interfering with the internal operation of a corporation. We further noted in *Cron* the absence of the statutory

requirements that warrant a court's intervening to dissolve a corporation. Here, as in *Cron*, we are asked to approve a district court's acting as a court of equity to substitute its judgment for that of the officers or board of directors of a corporation. In *Cron*, we denied such a request by responding:

"It is not the function of the court to manage a corporation nor substitute its own judgment for that of the officers thereof. It is only when the officers are guilty of willful abuse of their discretionary power or of bad faith, neglect of duty, perversion of the corporate purpose, or when fraud or breach of trust are involved, that the courts will interfere." 171 Kan. at 64.

Here, the district court interfered in the internal affairs of Bethany by enjoining it from amending its articles of incorporation as to the distribution of its assets upon dissolution. Based upon the factual record in this case, the district court's order so enjoining Bethany was a denial of due process, not warranted, and constituted an abuse of discretion. We affirm the district court's order refusing to dissolve Bethany and reverse its order enjoining Bethany from amending its articles of incorporation.

The judgment of the district court is affirmed in part and reversed in part.