# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-00219-SCT

*THE CITY OF PICAYUNE, A MISSISSIPPI MUNICIPAL CORPORATION; PATRICIA CROSBY, WOODY SPIERS, AHMAD HAIDAR, M.D., JOHN R. PIGOTT, MARIA G. BEVERAGE, CROSBY HOSPITAL AUXILIARY, AN UNINCORPORATED ASSOCIATION, THROUGH ITS PRESIDENT MARTHA J. SHEPPARD*

*v.*

*SOUTHERN REGIONAL CORPORATION f/k/a LUCIUS O. CROSBY MEMORIAL HOSPITAL, A MISSISSIPPI NON-PROFIT CORPORATION, AND SIDNEY L. WHITLEY, TED J. ALEXANDER, STANLEY JACK WATSON, CLYDE DEASE, JO WOODS, CHARLOTTE ODOM, THOMAS M. CASEY AND LOWER PEARL RIVER VALLEY FOUNDATION, A MISSISSIPPI NON-PROFIT CORPORATION*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/08/2003 |
| TRIAL JUDGE: | HON. JAMES H. C. THOMAS, JR. |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | G. GERALD CRUTHIRD |
| | GLENN LOUIS WHITE |
| | STEPHEN SHEPPARD |
| ATTORNEYS FOR APPELLEES: | SCOTT W. PEDIGO |
| | JAMES LAWRENCE JONES |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: REVERSED AND RENDERED - 12/08/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., CARLSON, AND RANDOLPH, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     This case is before us on appeal from a judgment handed down by the Pearl River County Chancery Court wherein the chancellor ruled to dismiss all claims asserted by representative citizens of the City of Picayune against the Southern Regional Corporation, the Lower Pearl River Valley Foundation and the common board of directors known to each. Additionally, this case is before us on cross-appeal, as the named defendants challenge a collateral determination made by the chancellor wherein he recognized that the representative citizens of Picayune had standing to bring this action. Focusing on the threshold issue presented on cross-appeal, we affirm the chancery court's judgment on direct appeal, but for reasons different than those stated by the chancellor. Finding that the representative citizens lacked the requisite standing to bring this suit, we reverse the chancellor's judgment finding that the representative citizens of the City of Picayune had standing to bring this action, and render judgment here in favor of the appellees/cross-appellants.

## FACTS AND THE PROCEEDINGS IN THE CHANCERY COURT

### A.     The history and incorporation of the Crosby Memorial Hospital Corporation:

¶2.     In 1949, the City of Picayune ("the City") began to consider building a hospital for the benefit of its residents. The December 12, 1949, minutes of the Mayor and Board of Alderman evidence this intention and reflect that the Ethel Crosby Foundation donated money to the City for the stated purpose of purchasing land on which to build a new hospital. While it is unclear who was originally responsible for the hospital initiative, it is clear that in 1950 the City issued hospital bonds in the amount of $90,000 and approved a contract for an

architect to draw up the plans for its proposed municipal hospital, only to release the architect the very next year when it was unable to secure a grant of federal funds.

¶3.    In 1951, the Crosby family, who had a sincere interest in providing their community with a functional medical center, incorporated the Lucius O. Crosby Memorial Hospital (heretofore referred to as the "Crosby Memorial Hospital Corporation" or "CMHC").[1]    Clearly a corporate expression of the Crosby family's desire to give back to their community, the Crosby Memorial Hospital Corporation was incorporated as a Mississippi nonprofit with a strictly charitable purpose.    The incorporators are listed on the charter as: R.H. Crosby; R.H. Crosby, Jr.; L.O. Crosby, Jr.; Richard C. Crosby; and T.L. Crosby and for corporate purposes are considered the original "members."[2]

¶4.    The charitable purpose of the Crosby family's corporation was "to acquire real estate for and to construct, purchase and otherwise acquire, equip, operate and maintain one or more hospitals..."    Pursuant to the corporation's newly specified bylaws, the already-named corporate "members" were empowered to and did elect the Crosby Memorial Hospital Corporation's Board of Trustees.[3]    Accordingly, they appointed five officers to this board for one year terms and charged each of them with the duty of managing the day-to-day business of

---

[1]The Lucius O. Crosby Memorial Hospital is the original corporate entity initiated by the Crosby family to aid in providing the Picayune community with a hospital.  This corporation would eventually become known as the Southern Regional Corporation.

[2]Member, as defined by Miss. Code Ann. § 79-11-127(v) means any person who on one or more occasion pursuant to a provision of a corporation's articles or bylaws has the right to vote for the election of a director or directors.

[3]For the purpose of this case and as determined by Chancellor Thomas, the term "Trustees" is of no real legal significance other than its use as a term of reference for a governing body within the Crosby Memorial Hospital Corporation.

the corporation. At different times, and up until 1977, Crosby family members held a majority of the management positions within CMHC and, in this way, served the corporation as "Members", Trustees and managing corporate officers.

¶5.     On October 2, 1951, after the City withdrew its application for a license to operate a hospital and sold the donated land where the hospital was to have been built, CMCH proceeded in the City's stead and oversaw the construction of what became the Crosby Memorial Hospital("CMH"). Raising funds from grants-in-aid which came from the State of Mississippi in the amount of $184,590, from the Ethel Crosby Foundation in the amount of $92,395, and from Crosby Chemical, Inc. in the amount of $675,298, the Crosbys utilized CMHC as their vehicle to erect CMH for a total cost of $952,284. Upon completion, CMH was then leased to the City for token consideration.

¶6.     From 1954 to October 27, 1964, CMHC entered into three successive lease agreements with the City. After the final lease term terminated, the City assigned all of its rights relating to CMH back to CMHC, which planned to manage CMH as a nonprofit facility for the next ten years. Coordinate to this assignment, CMCH amended its bylaws. Accordingly, the Crosby family amended the corporate charter to allow for the expansion of membership "at any time by consent of a majority of members present at any meeting," to expand the  Board of Trustees from five (5) to seven (7) trustees and to create an additional Board of Governors, which was charged with overseeing the operations of the hospital and related facilities. Specifically, the bylaws required that the new Board of Governors be elected by CMHC's Board of Trustees.

4

¶7.    After the 1964 assignment, no significant changes occurred until 1977. Up until this time, the management positions of CMHC had been predominantly held by members of the Crosby family; however, in August 1977, the Crosby family members effectuated a major change in their closely held corporation by officially resigning their positions with CMHC's management.  To this end, the participant "members" of the Crosby family turned in their resignations after unanimously electing seven new "members" pursuant to the enumerated corporate structure.  The newly elected, non-Crosby family "members" were: S.G. Thigpen, Jr., Dr. D.L. Bolton, Dr. C.G. Blackburn, Ms. Trinity Williams, Ms. R.B. Vaughn, R.T. McRaney and C.J. Chatman.  In turning over the reins of their non-profit corporation to the new members, the Crosbys imposed no restrictions on the corporation's assets.[4]

¶8.    The front office and organizational changes made within CMHC were accompanied by improvements to CMH's facilities.  City records show that the City council worked with CMH to improve the facility, either by providing additional city services, or waiving fees for building permits or other municipal costs incurred by CMH.

¶9.    In 1987, CMHC, with the secretary of state's approval, again amended and restated its charter and corporate mission.[5]  The revised charter expanded the corporate purpose, and the corporation officially became "a nonprofit, non-share corporation for charitable, medical, scientific and educational purposes."  The broad purposes included in the charter focused on

---

[4]By virtue of their positions with Crosby Memorial Hospital prior to their resignation, the Crosbys could have added specific provisions within the corporate charter imposing a trust, or otherwise restricting corporate assets; however, in the process of removing themselves from corporate management, they included no such provisions.

[5]A restated charter allows a corporation to bring all of its amendments forward into one new document and to simply add only the newest amendments.  In today's case, without restatement there would be a charter in 1951 with thirty six years of amendments.

"participating, so far as circumstances may warrant, in any activity designed and carried on to promote the general health of the community." Additionally, the 1987 amendments allowed for Communicare Systems, Inc. to be included in the CMHC membership and streamlined corporate management down to a singular Board of Governors elected directly by the corporate members. The 1987 amendments included important language concerning the dissolution of the corporation. Paragraph 10 of the amendments provided:

> Upon the dissolution of the corporation, the Board of Governors shall, after paying or making provision for the payment of all the liabilities of the corporation, dispose of all assets of the corporation exclusively for the purposes of the corporation in such manner, or to such organization or organizations organized and operated exclusively for charitable, educational, religious, or scientific purposes as shall at the time qualified as an exempt organization or organizations under section 501(c)(3) of the Internal Revenue Code of 1954 (or the corresponding provision of any further United States Internal Revenue Law), as the Board of Governors shall determine. Any such assets not disposed of shall be disposed of by the Chancery Court of the county in which the principal office of the corporation is then located, exclusively for such purposes or to such organization or organizations, as said Court shall determine, which are organized and operated exclusively for such purposes.

¶10. After the adoption of the 1987 amended charter, four years passed until more changes were implemented, and, in 1992, CMHC was again streamlined. According to the newly revised Articles of Incorporation, there was to be one governing body, the Board of Governors, comprised of nine individuals serving both roles of "member" and "governor." Importantly, this new corporate structure, with a single governing board, has remained in place ever since. Another major change resulting from the 1992 amendments was the merger of Crosby Health Foundation, CMH, and Communicare Systems. Moreover, Articles of Merger were filed with the Secretary of State and the bylaws of CMHC became the bylaws of the new unified corporation.

6

**B.    The Crosby Memorial Hospital Corporation's decision to sell and lease CMH, and to incorporate a new charitable foundation with the proceeds:**

¶11.    In 1995, the Crosby Memorial Hospital Corporation began to assess alternatives to confront the many challenges it faced as a small nonprofit community hospital.  Faced with a dilemma typical to the age and the nature of its facility, the Board of Governors was forced to evaluate glaring and evolving problems associated with both its physical plant and the new dynamics of a competitive health care market.  Thus, the Board of Governors began discussing the practicability of renovating its facility and the long term financial viability of undertaking such a project.

¶12.    In pursuit of a comprehensive financial review, the Board of Governors initiated several surveys, studies, and assessments, including a facility survey and evaluation, a debt capacity study, and a community needs survey.  After three years of review, the Board of Governors determined that it would be imprudent and impractical to finance the significant needed renovations to the hospital, or in the alternative, to build a new facility.  Accordingly, CMHC began actively pursuing buyers for CMH and, in August 1998, it issued a letter of intent confirming a proposed sale of the facility to New American Healthcare Corporation ("NAHC").  The letter of intent contained material terms of the parties' agreement.[6]  In addition to standard buyout terms, NAHC agreed to become contractually obligated to spend

---

[6] Specifically, the terms provided that NAHC, or its affiliate NAHC of Mississippi, would lease and purchase all of the CMHC assets; CMH (the physical plant and its surrounding real estate) would be leased for a $15 million advance lease payment; and, the other non-cash assets would be purchased, except that the Southern Regional Corporation (SRC) would retain its community fitness center (the Cornerstone). Additionally, NAHC agreed to contribute $500,000 to a private foundation (LPRVF) to be established by SRC.

at least $18 million in constructing a new hospital facility within 30 months and in the interim to: (a) spend an average of at least $600,000 per annum for up to three years on repair and maintenance of the existing facility; and, (b) operate a 24-hour emergency room and provide obstetrical services for at least five years.

¶13. In preparation of the sale to NAHC, and in order to accommodate the impending liquid nature of corporate assets, the CMHC Board of Governors restated its articles of incorporation and renamed its company the Southern Regional Corporation ("SRC").[7] The corporate nature of SRC was reflected by its stated purpose, which was "to participate, so far as circumstances may warrant, in any activity designed and carried on to promote the general health of the community" and "to make grants to other 501(c)(3) entities organized exclusively for charitable, religious, educational, and scientific purposes, including but not limited to the Lower Pearl River Valley Foundation." Of note, the statement of purpose to operate a hospital was removed due to the inclusion of contractual language that forbade SRC from operating a hospital in NAHC of Mississippi's market area, and the name change was accomplished to avoid confusion between CMHC and CMH, which was now being operated by NAHC of Mississippi. These corporate amendments were filed with the Mississippi Secretary of State's office in February of 1999.

¶14. The primary, post-sale corporation was to become the Lower Pearl River Valley Foundation (LPRVF), which was officially incorporated in 1998. The registered agent at the time of incorporation was Ted Alexander, who was concurrently serving on the Board of Governors of SRC. Specifically, Ted Alexander, Sidney Whitley, Stanley Watson, Clyde

[7]*See supra*, footnote 5.

Dease, Thomas Casey and Calvin Green all served on the LPRVF Board. Notably, all board members except Calvin Green, who was the acting administrator of CMH, served on the SRC Board. The Board of Governors of SRC incorporated LPRVF in order to serve the community with charitable grants and, like SRC, also incorporated LPRVF as a Mississippi non-profit corporation, exempt from federal and state taxes. Unlike SRC, however, LPRVF was classified as a private foundation under the Internal Revenue Code. Consistent with their corporate, non-profit charter and their tax-exempt status, SRC and LPRVF were prohibited from providing financial support to for-profit entities as all monies associated with either corporation were designated for charitable use. While both corporations existed concurrently, SRC's continued existence was primarily to finalize the sale of CMH to NAHC, close out pension plans, and deal with pending lawsuits.

¶15. Proceeds from the sale and lease of the CMH facility were transferred to LPRVF and SRC. Specifically, per the NAHC-SRC transaction, NAHC of Mississippi paid $500,000 directly to LPRVF, $1,500,000 to SRC for operational expenses, and ultimately paid out the balance of the purchase price, approximately $15,520,000, to LPRVF via SRC to be passed on after the transaction was completed.[8] Both SRC and LPRVF presidents signed the assumption and waiver agreement with NAHC of Mississippi and its parent company NAHC, and the transfer was unanimously approved by SRC's Board members.

¶16. Pursuant to its status as a Code 501(c)(3) entity, LPRVF through its written investment, grant making, conflict of interest, and financial disclosure policies, ensured that its assets

---

[8]According to the minutes of the LPRVF meeting held on February 5, 1999, the funds given to LPRVF by SRC from the sale of CMH (a.k.a. the Crosby Memorial Hospital facility) were to be transferred to LPRVF from the CMH account after the completion of the sale.

9

would be administered for the benefit of the community and not enure for the benefit of private individuals.[9]

¶17. After the purchase of CMH from SRC, NAHC filed for Chapter 11 bankruptcy. In August of 2000, Picayune Clinic leased the CMH facility from NAHC through negotiations which were approved by SRC, which still retained legal ownership of the hospital facility. At the time of the chancery court ruling in this case, Picayune Clinic was operating CMH as a for-profit hospital. As part of its contract with NAHC and SRC, the Picayune Clinic was required to make annual capital improvements to the hospital facility in the amount of $600,000 and to provide acute care services at the same level as previously provided by CMH, including obstetrical and emergency services. Additionally, Picayune Clinic agreed not to pursue any of the proceeds from the NAHC transaction, so as not to imperil the tax exempt status of LPRVF.

### C. Proceedings in Chancery Court:

¶18. Soon after the NAHC bankruptcy, the City filed suit in the Chancery Court of Pearl River County on behalf of the citizens of Picayune and surrounding areas naming SRC, LPRVF, and the seven directors of two corporate entities as defendants.[10] In its complaint, the City alleged, inter alia, that the assets of SRC and LPRVF were held in trust for the benefit of the citizens of Picayune by way of an implied trust; that the City was entitled to damages for restitution due to the defendants' negligent entrustment of trust properties; and, that the City

---

[9]LPRVF's financial disclosure policy provides for annual reporting to the Attorney General, disclosure of information to the public in response to requests and on a yearly basis, and the public announcement of all grants. Moreover, LPRVF is required by federal law to award grants of at least five percent of its funds each year, which may be paid from investment income on the funds.

[10]The named directors were Sidney L. Whitely, Ted J. Alexander, Stanley Jack Watson, Clyde Dease, Jo Woods, Charlotte Odom, and Thomas M. Casey (collectively, the "defendants").

was entitled to an equitable accounting, appointment of a master and receiver, and other appropriate relief.

¶19. The defendants responded by initially removing the case to the United States District Court for the Southern District of Mississippi and then, subsequently, to the United States Bankruptcy Court for the Middle District of Tennessee. When both removals resulted in remand to state court, the defendants proceeded in chancery court and filed a motion requesting dismissal, asserting that the City lacked the requisite standing to pursue its claims and had failed to state a claim upon which relief could be granted. Specifically, the defendants argued that the City was unable to assert a claim on behalf of its citizens and the residents of the surrounding area. In response to this motion, Chancellor James H.C. Thomas, Jr., entered an order dismissing all of the City's claims asserted on behalf of its citizens, but authorizing the City to pursue claims asserted through its corporate capacity.

¶20. In response to the dismissal order, Patricia Crosby, Woody Spiers, Ahmad Haidar, John R. Pigott, Maria Beverage and Martha Sheppard (collectively "the Intervenors") intervened and re-asserted the legal positions and adopted the discovery responses submitted by the City. However, the City subsequently dismissed all of its claims with prejudice, thus leaving the Intervenors to pursue their representative claims. In addition to the City's original claims, the Intervenors added allegations that they, "as individual citizens could show that they were victims of fraud, duress or other unconscionable conduct on the part of the Defendants resulting in the defendants' obtaining and holding title to the proceeds and other assets derived from the lease and sale [of CMH] so that a constructive trust has arisen for their benefit." By way of direct response to the Intervenors' presence in the suit and their allegations, the

defendants filed motions with the chancery court to dismiss the Intervenors' claims for lack of standing. In an order handed down on December 26, 2001, Chancellor Thomas denied the defendants' motion pending consideration of evidence at trial.

¶21. After a four day trial in July, 2002, the chancellor, despite recognizing standing, dismissed the Intervenors' claims. In so ruling, Chancellor Thomas made note of SRC's prominent charitable role in the City of Picayune and the mutually beneficial relationship which the two entities had maintained over the previous five decades. Aggrieved by the ruling of the chancery court, the Intervenors timely filed their notice of appeal from the chancellor's final judgment. In turn, the defendants filed a cross-appeal with this Court challenging both the chancellor's order granting the Intervenors' motion to intervene and the chancellor's opinion concluding that the Intervenors had standing to bring suit. Both appeals are now properly before this Court for disposition.

## STANDARD OF REVIEW

¶22. The standard of review for findings of fact by the chancellor is that such findings will not be disturbed on appeal unless they are manifestly wrong, clearly erroneous, or not supported by substantial credible evidence. ***Brown v. Mississippi Dept. of Human Services***, 806 So.2d 1004, 1005 (Miss. 2000) (citing ***Sandlin v. Sandlin***, 699 So.2d 1198, 1202 (Miss. 1997). Where there is substantial evidence to support the chancellor's findings, this Court is without the authority to disturb the chancellor's conclusions, although we might have found otherwise as an original matter. ***In re Guardianship of Savell***, 876 So.2d 308, 312 (Miss. 2004) (citing ***In re Estate of Harris***, 539 So.2d 1040, 1043 (Miss. 1989)). Additionally, where the chancellor has made no specific findings, we will proceed on the assumption that

12

the chancellor resolved all such fact issues in favor of the appellee. *Newsom v. Newsom*, 557 So.2d 511, 514 (Miss. 1990).

¶23.    While we give deference to a chancellor's determination of fact, we review the chancellor's determinations of law de novo.  Importantly, questions regarding the applicability of a constructive trust, or whether a party has legal standing to sue require us to examine both case law and any appropriate statutory law in order to determine whether the relevant law was properly applied in the trial court.  In *Davidson v. Davidson*, 667 So.2d 616 (Miss. 1995), we specified that this Court retains a de novo review of all questions of law, including those regarding the applicability of a constructive trust. *Id*. at 620 (citing *Seymour v. Brunswick*, 655 So.2d 892 (Miss. 1995) and *Harrison County v. City of Gulfport*, 557 So.2d 780, 784 (Miss. 1990)).  Additionally, in *Brown v. Mississippi Dep't of Human Servs.*, 806 So.2d 1004 (Miss. 2000), we considered the standard of review regarding standing.  At issue in *Brown* was whether Brown had legal standing to bring an action against the Department of Human Services under the applicable statute after having assigned her rights in order to receive delinquent child support payments from the Aid to Families with Dependent Children program. *Id*. at 1005.  In reconciling this issue and interpreting statute, we recognized that "[t]hese are questions of law reviewed under the de novo standard." *Id*. at 1006 (citing *Dep't of Human Servs. v. Gaddis*, 730 So.2d 1116, 1117 (Miss. 1998); *Miss. State Dep't of Human Servs. v. Barnett*, 633 So.2d 430, 434 (Miss. 1993)).

## DISCUSSION

13

¶24.  The Intervenors present several issues on appeal.   Specifically, the Intervenors argue that the proceeds realized from SRC's sale and lease of CMH should be reserved by way of either a constructive trust or an implied resulting trust.   Furthermore, they argue that one of these equitable trust remedies should have been imposed on the proceeds of the CMH sale/lease and that the chancellor failed to declare that the assets held by SRC, as a charitable corporation, should be dedicated to the corporation's original purpose per application of the *cy-pres* doctrine.[11]   Alternatively, under more common equitable principles, the Intervenors ask this Court to find unjust enrichment, detrimental reliance, and breach of fiduciary duties on the part of the defendant corporations and their board of governors.

¶25.  Before addressing the Intervenors' arguments, however, this Court must first consider the threshold issue of standing, as raised on cross-appeal by the defendants.   Accordingly, we must determine whether the Intervenors had the right to participate in this cause of action and to ultimately bring the defendants before the chancery court.   Fundamental to this review is whether SRC is  a non-profit corporation whose purpose was to make charitable grants to the City of Picayune and its surrounding community, or to hold its assets as a charitable trust created for the benefit of the indefinite class of individuals who reside in the City of Picayune and it surrounding areas.   Once the appropriate characterization of SRC is established and the body of law by which SRC is governed is determined, we must ultimately decide whether a citizen, as a representative of the public's interest, can legally challenge the authority, statutory or otherwise, of a Mississippi non-profit corporation to manage its corporate assets.   Finding

---

[11]The *cy-pres* doctrine, which means as near as possible, is a rule of construction of instruments in equity by which the intention of the party is carried out as near as may be, when it would be impossible or illegal to afford the instrument its literal effect. Black's Law Dictionary 387 (6th ed. 1990).

the standing issue presented on cross-appeal dispositive of this case, we find that the chancellor erred in allowing the Intervenors to intervene in this action, since the Intervenors failed to establish a substantive legal right on which to base their claims for relief. Similarly, on direct appeal, we affirm the chancery court's dismissal of the Intervenors' claims, but for reasons different than those stated by the chancellor.

## I. WHETHER SRC, f/k/a LUCIOUS O. CROSBY MEMORIAL HOSPITAL, IS GOVERNED BY THE MISSISSIPPI NON-PROFIT CORPORATION ACT.

¶26. A determination of whether the defendants' actions are governed by trust law or corporate law is important to our review of the issue of the Intervenors' standing. While distinguishing the bodies of law is quite simple when made in the context of distinguishing between a for-profit corporation and a private trust, it becomes more difficult when these legal vehicles were created to accomplish a purely charitable purpose. Moreover, both mechanisms are favored by our tax laws, can be tailored by its creator to achieve specific charitable purposes and can be monitored by the state which, in the interest of the public, can ensure accomplishment of such charitable purposes. Both are distinguishable and the equitable, as well as statutory, jurisprudence applying to each is unique.

¶27. Our decision in *Children's Home Society v. City of Jackson*, 230 Miss. 546, 93 So.2d 483 (1957) lends to confusion in resolving the issues of this case. *Children's Home Society* remains one of the rare cases where we previously discussed the two comparable bodies of law invoked by the parties today. In analyzing *Children's Home Society*, the law of the case can

be interpreted as stating that some principles of charitable trust law are interchangeable with those of charitable corporate law. In *Children's Home Society*, we stated:

> Most of the principles applicable to charitable trusts are applicable to charitable corporations. The restrictions in the deed are valid and enforceable, as they would be if the property were given to individual trustees for charitable purposes. In each case the question is whether the rule which is applicable to trustees is applicable to the particular charitable corporation with respect to the restricted use of the property. The Gale deed warrants their application to the appellant. This is in accord with the stated purposes of the grantor and the general rule. 4 Scott, Trusts (2d ed. 1956) Sec. 348.1; Annotation 1941, 130 A.L.R. 1101, 1121; *Old Ladies' Home Ass'n v. Grubbs' Estate*, 1939, 191 Miss. 250, 199 So. 287, 2 So.2d 593.

230 Miss. at 554, 93 So.2d at 486.

¶28. In his opinion dismissing the claims of the Intervenors and re-asserting his finding of standing, Chancellor Thomas cited to and interpreted the above language correctly, and noted that a corporation can be held as a holder of trust property. Applying this language to the case at bar, the chancellor reconciled that there was no evidence of restrictions and no evidence of trust language contained in the corporate documents of SRC or the documents relating to the purchase of the land by CMH. In his opinion, the chancellor invited this Court to review this area of the law and noted that "the Supreme Court has given little guidance over which rules applicable to trustees [are] applicable to charitable corporations."

¶29. *Children's Home Society* dealt with a charitable trust in which the donor expressly delineated how trust property was to be passed in the event that the charitable use for which he intended his trust property terminated. *Id*. at 484. Since the gift was originally given in trust to a non-profit, charitable corporation, the question before this Court was whether the non-profit corporation should (1) be permitted to sell or lease the donated property and dedicate

16

the proceeds to its charitable purpose, or (2) be required to follow the express terms of the instrument which created the charitable trust. In ruling that the gift must follow the express terms of the trust, this Court noted that the equitable doctrine of approximation was inoperable where a settlor had made an express provision for an alternative disposition of his property.[12] *Id*. at 488. Stressing the importance of the donor's intent, this Court paid homage to the settlor's manifest intent and ruled that permitting the non-profit corporation to sell the trust property in this case would emasculate the purpose of his gift. *Id*.

¶30. *Children's Home Society* is easily distinguishable from the case at bar. The language found in *Children's Home Society* and the very resolution of the case were solely dependent on principles of trust law. Moreover, in that case there was a gift, albeit made to a non-profit corporation, in which disposition, as properly determined by this Court, was strictly subject to the express terms set forth by the trust instrument. It follows that in such cases, non-profit corporations are placed in the exact same position as a trustee would be for purposes of executing a trust instrument and, thus, are similarly subject to the restrictions placed on the use of the property as a trustee would be. In this unique way, charitable trusts and charitable corporations are bound by the same restriction – donor intent. Accordingly, the express intent of the donor and the charitable purpose for which that donor created the trust maintain their sanctity no matter in whose care the trust is placed or what kind of entity is benefitted by or controls the trust *res*.

---

[12]The Doctrine of Approximation allows a court to substitute another charitable object which it believes approaches the original purpose of a trust when compliance with the original purpose becomes impracticable.

¶31.    As noted, *Children's Home Society* is the rare case wherein we discern the common ground shared by trust and corporate law with respect to charities.  With that in mind and for purposes of comparison, we look to another jurisdiction in order to examine its similar approach to this issue in a case involving a parallel factual scenario.  In so doing, we make initial note of Kansas State District Court Judge Stephen D. Hill's unique appraisal of the arguments presented before him at trial and we agree with his assessment of the case in which he likened the two contrasting arguments, and the different bodies of law presented, to "ships, on two completely separate courses, passing in the night." *Kansas East Conference of United Methodist Church, Inc. v. Bethany Medical Center, Inc*., 266 Kan. 366, 370, 969 P.2d 859, 862, (Kan. 1998).[13]    In *United Methodist Church*, the Kansas Supreme Court, applying reasoning similar to that which we use today, had to decide whether trust or corporate law governed the resolution of its case.  Moreover, the Kansas Supreme Court had to determine whether the $40 million dollar sale of assets by the Bethany Medical Center, a not-for-profit charitable corporation pursuant to the Charitable Organizations and Solicitations Act [COSA], was governed by trust law or corporate law. *Id*. at 860-61.  Bethany's Board was originally controlled by another interested party but, based on amendments to Bethany's articles of incorporation instituted by that interested party, it became wholly independent. *Id*.  In arguing that it was entitled to Bethany's assets, the interested party sought to resolve the case under principles of trust law and to restrict Bethany's assets by having them declared as held in trust for the corporate purpose originally designated at the time of incorporation. *Id*. at 863.  The

---

[13]The quoted language from Judge Hill is found in this cited opinion of the Supreme Court of Kansas.

interested party predicated its theory on the Restatement (Second) of Trusts 348, comment f (1957), and cited to language coordinate to the language used in ***Children's Home Society***, which could be construed as recommending the application of the rules governing charitable trusts to the rules governing charitable corporations. ***Id***.  In deciphering the language contained in the Restatement, the Kansas Supreme Court stated:

> [T]he Comment has little or no relation to the circumstances of the present case because the Comment (and the Restatement section) contemplates a settlor or donor *manifesting an intention to create a charitable trust and devoting property to accomplish the charitable purpose*. Bethany's history is replete with charitable giving, but it does not include the particular elements of a charitable *trust,* as defined in 348.

***Id***.  (Emphasis added).  The Kansas Court appropriately distinguished its case from a trust case, stating that:

> This is not a case in which a donor put money in a trust to be used for the creation and financial support of a hospital. Instead, it is a case where five Methodists incorporated in 1892 for the purpose of providing medical care in Wyandotte County, solicited charitable contributions, formed a foundation to solicit contributions, and accepted contributions from the Methodist church. Over the years, the Conference has been closely associated with Bethany and has been a significant benefactor, but there is no evidence of its acting as a trust settlor. Because Bethany is a corporate entity and held the title, Galen purchased the hospital from and paid Bethany for it. The theory which the Conference has formulated for its entitlement to the sale proceeds, therefore, involves disqualifying the Bethany corporation. The Conference seeks to do so on the ground that Bethany can no longer fulfill its purpose, which in the Conference's construct is synonymous with the donor's intent.

***Id.*** at 863 - 64.  The Kansas Supreme Court ultimately concluded that the sale of the hospital to a for-profit corporation was a corporate law matter.  The Court found that Bethany's alleged abandonment of its corporate purpose was not determinative of which body of law to apply and stated: "In the present case, Bethany's primary purpose was operating a hospital, but operating

19

a hospital was not its sole activity.   Even if it had been...the effect of the sale on Bethany is governed by the corporation code." *Id*. at 864.

¶32.    There is a key distinction to be made here.  A charitable trust is a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and it subjects the person by whom the property is held to equitable duties and mandates that the property be dedicated to a charitable purpose.  Restatement (Second) Trusts § 348 (2005).  A charitable trust is strictly guided by its charitable purpose and the specific intentions of its settlor.   To this end, principles of equity act to ensure that the settlor's intentions, whatever they may be, are accomplished or are accomplished as nearly as possible.   In this way, the doctrine of *cy-pres* or of approximation can be applicable to gifts made in trust to charitable corporations as well as to such gifts made to an individual trustee to be dedicated to a charitable purpose. Restatement (Second) Trusts § 348.

¶33.    In slight contrast, a charitable corporation is any corporation or organization founded upon donations and engaged without profit in charitable activities and in no other activity of a commercial or gainful nature. 15 Am. Jur. 2d § 171 (2000).   Moreover, the basic requirement of a nonprofit, public benefit entity is that it be operated exclusively for a charitable purpose, that it serve the public rather than a private interest and that its income or assets not be distributed to individuals in control of the entity. 18 Am. Jur. 2d § 34 (2004). Like a charitable trust, a charitable corporation is predicated on a charitable purpose. However, unlike a trust, a charitable corporation is spawned as an independent entity possessing free will to the extent provided by its own articles of incorporation, bylaws and the laws of the state in which it is incorporated.   While these corporate entities are directed by a

20

charitable purpose, they remain autonomous unto themselves in maintaining and perpetuating the nature and classification of this purpose. Specifically, a corporation acquires its existence and authority to act from the state and, as such, is a creature of statute. 18 Am. Jur.2d § 14 (2004). As a general rule, the courts refrain from interfering with the internal management of a corporation and do not interfere in the affairs of a private corporation in the absence of proof of bad faith or fraud on the part of those entrusted with its management. 18 Am. Jur.2d § 8 (2004). In *United Methodist Church*, the Kansas Supreme Court made note of this well-accepted precept of corporate jurisprudence:

> It is well settled that the directors of a corporation are charged with the duty of managing its affairs and only in cases of the greatest emergency are courts warranted in interfering with the internal operation of its affairs. It has been said that the fundamental principle of a corporation is that a majority of its stockholders have the right to manage its affairs so long as they keep within their charter and no principle of law is more firmly fixed in our jurisprudence than the one which declares that courts will not interfere in matters involving merely the judgment of the majority in exercising control over corporate affairs. (*Feess v. Bank*, 84 Kan. 828, 115 Pac. 563, LRA 1915A, 606; 866 *Beard v. Achenbach Memorial Hospital Ass'n*, 170 Fed.2d 859.) 171 Kan. at 62, 229 P.2d 1008.

266 Kan. at 375-76 , 969 P.2d at 865-66 (quoting from *Cron v. Tanner*, 171 Kan. 57, 62, 229 P.2d 1008 (1951)).

¶34. In today's case, we have a non-profit charitable corporation incorporated under the laws of Mississippi in 1951 for the charitable purpose of building a hospital. Just as in *United Methodist Church*, this is not a case in which a donor put money in a trust to be used for the creation and financial support of a hospital. Instead, we have a corporation which was founded by five members who were then authorized to elect a Board of Directors and who ultimately

21

drafted the corporation's original bylaws.[14]  Of note, item seven of the original corporate charter indicates the Crosbys' original intentions by way of corporate form as well as charitable purpose:

> (a) To acquire real estate for, and to construct, purchase, and otherwise acquire, equip, operate and maintain one or more hospitals, to be used entirely for hospital purposes, and Nurses' Homes and Nurses' Training Schools in connection therewith, and related facilities and to establish and maintain one or more charity wards that are for charity patients, provided that all the income from said hospitals, Nurses' Homes and Nurses' Training Schools, shall be used entirely and exclusively for the purposes thereof and not part of the same for profit, and provided further, that no dividends, or profits derived from the operation of said Hospitals, Nursing Homes , and/or Nurses' Training Schools, shall be divided between the members of this corporations; and provided further, that expulsion shall be the only remedy for the nonpayment of dues, with the right, however vested in each member while a member of this corporation to cast one vote in the election of all officers; and provided further, that the loss of membership by death or otherwise shall terminate the interest of such member in the *corporate assets* of *this corporation*; and provided further, that there shall be no individual liabilities against the members of this *corporation* for *its corporate debts* but the entire *corporate property* shall be liable for the claims of creditors.

> (b) In addition to the rights and powers herein above described and expressed, *the corporation may exercise such additional powers as are conferred by Chapter 4, Title 21, Code of Mississippi of 1942, as amended by Chapter 308, General Laws of Mississippi of 1950.*

(Emphasis added).

¶35.   In **Allgood v. Bradford**, 473 So. 2d 402 (Miss. 1985), we examined charitable corporations and characterized what defines a charitable corporation under Mississippi law. To this end, we stated:

> Palmer came into existence under the Mississippi corporation law as an independent legal entity with the usual rights to hold property in its own name, manage its own business, and alter or repeal its charter provisions in order to

---

[14]Member, for the purposes of our case, is the equivalent of a shareholder.

22

> carry out its charitable purposes. Title to all Palmer property has remained in the name of the corporation itself, and since 1950 the charters have recognized that the corporation is owned by the board of trustees.

*Id*. at 412.

¶36. A factual parallel to the corporate entity alluded to in ***Allgood***, SRC was incorporated under Chapter 4, Title 21, Miss. Code Ann. (1942), and brought into being as a Mississippi corporation. Moreover, pursuant to our code, which now includes the Mississippi Non-Profit Corporation Act, SRC came into existence as an independent legal entity with the usual rights to hold property in its own name, to manage its own business, and to alter or repeal its charter provisions in order to carry out its charitable purposes. To this end, SRC has consistently acted pursuant to the laws enumerated within the corporate code and should thus be governed accordingly. For these reasons, we conclude that the issue of standing in this case should be determined under the applicable non-profit corporate provisions found in the Mississippi Code.

## II. WHETHER THE INTERVENORS HAVE LEGAL STANDING TO SUE SRC.

¶37. Having determined that SRC, as a non-profit charitable corporation, is subject to our corporate statutes, we now address the issue of whether the Intervenors had standing to request the chancery court for relief. Specifically, we consider Chancellor Thomas's determination that, due to SRC's fifty-year history of operating for the benefit of its surrounding community, the citizen Intervenors, as beneficiaries, had a "colorable" interest in the proceeds obtained by SRC from its sale and lease of CMH.

¶38. Before moving forward with this issue and for the purpose of clarity, we must first examine our general law of standing. In *Harrison County v. City of Gulfport*, 557 So.2d 780, 782 (Miss. 1990), we addressed a standing issue and stated, "[p]arties may sue or intervene where they assert a colorable interest in the subject matter of the litigation or experience an adverse effect from the conduct of the defendant." *Id*. at 782 (*see Dye v. State ex rel. Hale*, 507 So.2d 332, 338 (Miss. 1987); *Frazier v. State of Mississippi*, 504 So.2d 675, 691-92 (Miss.1987); *Belhaven Improvement Association, Inc. v. City of Jackson*, 507 So.2d 41, 45-47 (Miss. 1987)). Parties may also sue or intervene as otherwise authorized by law. *See, e.g.*, *Canton Farm Equipment Co. v. Richardson*, 501 So.2d 1098, 1105-09 (Miss. 1987); *City of Pascagoula v. Scheffler*, 487 So.2d 196, 198 (Miss. 1986). Importantly, while we alluded to our general standing rule and noted its incorporation into statute, our ultimate focus in *Harrison County* was on the statute itself. Moreover, we recognized that a plaintiff's standing concerning annexation confirmation procedures depended solely on the language contained within the Mississippi Code, and we interpreted Miss. Code Ann. § 21-1-31, which specifically authorizes intervention by any party "interested in, affected by or aggrieved by a proposed annexation," in order to determine whether there was a colorable basis in fact for the intervening counties' claim. *Id*.

¶39. In *State of Mississippi v. Quitman County*, 807 So.2d 401 (Miss. 2001), we again highlighted our general rule that "[i]n Mississippi parties have standing to sue 'when they assert a colorable interest in the subject matter of the litigation or experience an adverse effect from the conduct of the defendant, or as otherwise provided by law.'" *Id*. at 405. (citing *Fordice v.*

24

*Bryan*, 651 So.2d 998, 1003 (Miss. 1995); *State ex rel. Moore v. Molpus,* 578 So.2d 624, 632 (Miss. 1991)). In *Quitman County*, however, as with a staggering majority of our cases involving standing, we sought to interpret Mississippi standing law under the guise of state governmental action. Thus, we had a government entity named as a defendant to a suit and had to determine whether the plaintiff had the right to seek judicial enforcement of a legal duty owed by this governmental entity. Quitman County brought suit in its own name and on behalf of its taxpayers against the state of Mississippi. In determining standing and answering the legal query presented by our general rule on standing, we interpreted "colorable interest" and "adverse affect" pursuant to our constitutional mandate and case precedent:

> It is well settled that "Mississippi's standing requirements are quite liberal." *Dunn v. Miss. State Dep't of Health*, 708 So.2d 67, 70 (Miss. 1998); *see also Miss. Gaming Comm'n v. Bd. of Educ.*, 691 So.2d 452-460 (Miss. 1997). This Court has explained that while federal courts adhere to a stringent definition of standing, limited by Art. 3, § 2 of the United States Constitution to a review of actual cases and controversies, the Mississippi Constitution contains no such restrictive language. *Van Slyke v. Bd. of Trustees of State Institutions of Higher Learning*, 613 So.2d 872, 880 (Miss. 1993) (citing *Sosna v. Iowa*, 419 U.S. 393, 397-403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975)). Therefore, this Court has been "more permissive in granting standing to parties who seek review of governmental actions." *Van Slyke*, 613 So.2d at 875. *See also Dye v. State ex rel. Hale*, 507 So.2d 332, 338 (Miss. 1987) (holding state senators had standing to sue Lieutenant Governor on charges that their legislative power had been impinged by his power).

807 So.2d at 405

¶40. Our general standing requirement is important to our review of standing issues because it appropriately focuses judicial review on a plaintiff's legal interest and a defendant's legal duty. However, it must be recognized that different standing requirements are accorded to different areas of the law, and an individual's legal interest or entitlement to assert a claim

25

against a defendant must be grounded in some legal right recognized by law, whether by statute or by common law. Quite simply, the issue adjudicated in a standing case is whether the particular plaintiff had a right to judicial enforcement of a legal duty of the defendant or, as stated in *American Book Co. v. Vandiver*, 181 Miss. 518, 178 So. 598 (1938), whether a party plaintiff in an action for legal relief can show in himself a present, existent actionable title or interest, and demonstrate that this right was complete at the time of the institution of the action. *Id*. at 599. "Such is the general rule." *Id*.

¶41. In today's case, we are guided by statute, and, as was the case in *Harrison County*, we must focus on the "or otherwise provided by law" language of our general standing requirement and interpret the statutory language provided for us in the Mississippi code. Accordingly, we are expressly directed to Miss. Code Ann. § 79-11-155, which governs the ability of a party to challenge a corporation's power to act:

> (1) Except as provided in subsection (2) of this section, the validity of corporate action may not be challenged on the ground that the corporation lacks or lacked power to act.

> (2) A corporation's power to act may be challenged in a proceeding against the corporation to enjoin an act where a third party has not acquired rights. The proceeding may be brought by the Attorney General, a director or by a member or members in a derivative proceeding.

> (3) A corporation's power to act may be challenged in a proceeding against an incumbent or former director, officer, employee or agent of the corporation. The proceeding may be brought by a director, the corporation, directly, derivatively, or through a receiver or by a trustee or other legal representative.

Miss. Code Ann. § 79-11-155 (2001).

¶42. This statutory language is straightforward and the legislative intent behind it is easily recognized. Moreover, pursuant to Miss. Code Ann. § 79-11-155, a suit of the nature as

before us today may be brought against a corporate entity in the State of Mississippi only "by the Attorney General, a director or by a member or members in a derivative proceeding." Limiting the ability of the public to ask for judicial interference with a corporation's ability to act is logical when one considers that "no principle of law is more firmly fixed in our jurisprudence than the one which declares that courts will not interfere in matters involving merely the judgment of the majority in exercising control over corporate affairs." *United Methodist Church*, 266 Kan. at 375-76, 969 P.2d at 865-66 (quoting from *Cron v. Tanner*, 171 Kan. 57, 62, 229 P.2d 1008 (1951)).

¶43.    In today's case, Chancellor Thomas concluded that the Intervenors had proper standing and cited to precedent in support of his conclusion. Relying on our holding in *Allgood v. Bradford*, 473 So.2d 402 (Miss. 1985), the chancellor attempted to define "membership." Reasoning that the charitable purpose of a charitable non-profit corporation changes its character for the purposes of membership, Chancellor Thomas cited to *Allgood* for the proposition that "[c]haritable corporations... have as their goal the improvement of the welfare of others, so that membership in this sort of corporation manifests freedom from selfishness." *Id.* at 412. The chancellor focused on the use of membership in this context and ultimately concluded that, as beneficiaries of the Crosby Memorial Hospital Corporation, the Intervenors were interested in, affected by, and aggrieved by, the lease and sale of the hospital asset.[15]

---

[15]The chancellor used language from *Harrison County v. City of Gulfport*, 557 So.2d 780, 782 (Miss.1990), where we interpreted Miss. Code Ann. § 21-1-31, which specifically authorizes intervention by any party "interested in, affected by or aggrieved by a proposed annexation."

¶44.   While the above cited language from *Allgood* was important to that case for the purpose of defining what constitutes a charitable, non-profit corporation, this language does little by way of contributing to a working definition of corporate membership.   Moreover, in *Allgood,* this Court went on to specifically examine the indicia of membership concerning our non-profit corporation statutes and stated:   "From these statutes, several indicia of membership are evident. The members are those who bring the corporation into being, vote for corporate officers, vote to dissolve the corporation, and on dissolution receive the assets of the corporation."[16] *Allgood*, 473 So.2d at 412.   While the statutes relied on in *Allgood* have since been amended, the basic tenor remains the same – a member is a stakeholder in the corporation and has the power to effectuate change in corporate management.

¶45.   Additionally, and in line with our determination in *Allgood*, the Mississippi Nonprofit Corporations Act, defines a "member" as follows:

> "Member" means (without regard to what a person is called in the articles or bylaws) any person or persons who on more than one (1) occasion, pursuant to a provision of a corporation's articles or bylaws, have the right to vote for the election of a director or directors.  A person is not a member by virtue of any of the following: (I) Any rights such person has as a delegate; (ii) Any rights such person has to designate a director or directors; or (iii) Any rights such person has as a director.

Miss. Code Ann. § 79-11-127.

¶46.   Consistent with precedent and pursuant to Miss. Code Ann. §§ 79-11-127, a member has a defined legal interest in a corporation inasmuch as the member brings that corporate entity into being, votes for its corporate management, votes to dissolve its corporate being, or,

---

[16]The non-profit statutory scheme set forth by our non-profit corporation act has been amended but for the purposes of this case remains substantively appropriate.

28

upon such dissolution, has a right to share in the disposition of corporate assets. In today's case, under these well-stated indicia of membership, it becomes clear that none of the Intervenors were qualified to bring suit as corporate members, having demonstrated only a limited tenuous public interest in the benefits provided by the hospital's charitable ownership. Furthermore, according to Miss. Code Ann. § 79-11-155, the Intervenors have failed to establish standing as, in addition to their failure to evidence corporate membership, they do not assert this action directly, as a current corporate director, or in the name of this state through its Attorney General. In no uncertain terms, the relief sought by the Intervenors, as mere putative beneficiaries of a charitable corporation's corporate acts, falls well outside of any legal interest in SRC. The Intervenors have no right to judicial enforcement of alleged legal duties claimed by them vis-a-vis the defendants.

¶47. The Intervenors are attempting to assert claims grounded in equity against a corporation and board of directors to which they have no confidential ties, from which they can expect no fiduciary duties and in which they have no proprietary interest. To presume standing under these facts and permit the Intervenors to challenge the business judgment of a properly elected board of governors of a corporation would be to say that an indefinite class of plaintiffs, who simply might receive benefit from acts of a charitable corporation, should have a legal voice in how the corporation is to be run, and further permit individuals from the benefitted public to improperly be deemed members of non-profit corporations, capable of instituting derivative suits against the corporate board of directors and causing the various courts of this state to dictate to charitable corporate officers how to manage their charitable corporations. This result offends the fundamental tenets of corporate law and the express intent of our state

29

legislature. We thus conclude that the Intervenors never possessed the requisite legal standing to assert claims against the defendants and that this case should have been dismissed before trial based on this want of legal or statutory ground to proceed.

## CONCLUSION

¶48. In clear terms, the Intervenors have failed to establish the legal grounds necessary to institute this suit against the defendants. Moreover, they have shown no colorable interest in the corporate entity from which they seek relief and have demonstrated no adverse effect or injury caused by the defendants' failure to perform a legal duty owed to them. Under our statutory scheme, a proper party with a colorable interest in SRC must assert a direct action as a corporate director, a derivative action as a member, or, on behalf of the citizens of Mississippi, as this state's Attorney General. To the extent that they fail to qualify in any of these express capacities and have failed to establish a substantive legal ground on which to base their claims for relief, the Intervenors had no standing to pursue their claims against the defendants. Thus, the trial court erred in finding that the Intervenors had standing to pursue their claims in this case. Because this issue presented on cross-appeal is dispositive of this case, we need not address the Intervenors' issues raised on their direct appeal. Accordingly, we affirm the chancellor's dismissal of the Intervenors' claims on direct appeal, but for reasons different than those stated by the chancellor. As to the cross-appeal, we reverse the chancellor's judgment granting the Intervenors standing to proceed in this litigation, and render judgment here in favor of Southern Regional Corporation and the Lower Pearl River Valley Foundation.

30

¶49.    **ON DIRECT APPEAL**:  **AFFIRMED; ON CROSS-APPEAL:  REVERSED AND RENDERED.**

      **SMITH, C.J., WALLER , P.J., DICKINSON AND RANDOLPH, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.  COBB, P.J., DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**